12084

EVANS *ET AL.* v. BEATTIE, COMPTROLLER GENERAL *ET AL.*

(135 S. E., 538)

1. HIGHWAYS.—Tax levied, under Coastal Highway Act for payment of bonds of highway district issued to advance money to highway commission, is "special assessment," and not general taxation.

2. HIGHWAYS.—Coastal Highway Act, creating highway districts, and levying special assessment, *held* not in violation of Constitution, Article 10, § 5, as being special assessment by legislative action.

3. CONSTITUTIONAL LAW.—Construction of Constitution adopted by General Assembly in enactment of statutes is entitled to weight, and in doubtful cases should be followed.

4. TAXATION.—Legislature is not forbidden by Constitution, Article 10, § 5, or any other constitutional provision, from levying directly a tax on political subdivision.

5. HIGHWAYS.—Tax provided for in Coastal Highway Act is levied by General Assembly, duties of Comptroller General in making annual levy being purely ministerial.

6. HIGHWAYS.—Legislature has power to levy taxes in highway district.

7. HIGHWAYS.—General Assembly, under general legislative powers, properly levied tax under Coastal Highway Act for payment of bonds issued by district for advancements to State Highway Commission, under Pay-As-You-Go Act.

8. CONSTITUTIONAL LAW—LAW CREATING HIGHWAY DISTRICT AND LEVYING TAX FOR PAYMENT OF BONDS HELD NOT VIOLATIVE OF DUE PROCESS AND EQUAL PROTECTION CLAUSES OF CONSTITUTIONS FOR FAILURE TO PROVIDE HEARING ON ASSESSMENTS, OR ARBITRARY DETERMINATION OF BENEFITS TO PROPERTY OWNERS (COASTAL HIGHWAY ACT).—Coastal Highway Act (34 St. at Large, p. 1492), creating highway district and levying tax for payment of bonds issued to advance money to State Highway Commission, *held* not in violation of due process and equal protection clauses in Federal or State Constitutions for failure to provide a hearing on assessment and because of arbitrary determination that highway was benefit for all property owners.

9. CONSTITUTIONAL LAW.—Where Legislature creates special tax district and defines it, fixes basis for taxation, and declares improvements authorized are for benefit of property owners, question of necessity of notice is concluded.

10. HIGHWAYS.—Coastal Highway Act, creating highway district and levying tax for bonds to be reimbursed by State Highway Com-

mission, under Pay-As-You-Go Act, *held* not in violation of Constitution, Article 10, § 5, limiting bonded debt.

11. HIGHWAYS.—Bonds secured by pledge of funds sufficient to meet obligations without resorting to levying property tax do not constitute "bonded debt," within Const., Art. 10, § 5.

12. JUDGMENT.—Decision in case decided by the court en banc is final and conclusive.

13. HIGHWAYS.—If bonds issued by highway district for advancement to state highway commission under reimbursement agreement constitute bonded debt (article 10, § 5), amount of reimbursement to be made should be offset in computing net bonded debt.

14. MUNICIPAL CORPORATIONS.—In computing bonded debt of municipality for purposes of constitutional or statutory limitation, sinking funds or other funds pledged for payment of debt should be deducted.

15. HIGHWAYS.—Coastal Highway Act *held* not to violate Constitution, Art. 1, § 11, for failure to specify terms of office of commissioners appointed therein until full performance of their duties.

16. OFFICERS.—"Office," as used in Const. Art. 1, § 11, requiring appointment for specific terms, means public station permanent in character, and "officer" means person holding such station.

17. HIGHWAYS.—If members of board of highway commissioners provided in Coastal Highway Act are "officers" within meaning of Const. Art. 1. § 11, provision that they shall serve until duties under Act are completed constitutes sufficient limitation of tenure of office.

18. HIGHWAYS.—Coastal Highway Act *held* not violate of Constitution in not requiring levy of taxes by fiscal authorities of road district, "levy," as used in Constitution, not referring to creation of tax, but merely to its collection.

19. HIGHWAYS.—Coastal Highway Act, creating road district for certain counties, *held* not in violation of Constitution for failure to follow constitutional amendment (33 St. at Large, p. 69), relating to plan of assessment in two counties included in district, since amendments did not forbid other taxation for road purposes.

20. STATUTES.—Coastal Highway Act *held* not in violation of Constitution, as amending Pay-As-You-Go Act, without reference in title thereto, since it could reasonably be derived from title that previous act was modified.

21. STATUTES.—Title of act need not specifically refer to previous statutes which are to be amended to satisfy constitutional requirement that subject of statute shall be expressed in title.

22. HIGHWAYS.—Coastal Highway Act, creating highway district of six counties, *held* not unconstitutional in permitting and requiring, under section 12a, joint county obligations.

23. CONSTITUTIONAL LAW.—Legislature may authorize two or more sub-
divisions to make a joint contract.

24. STATUTES.—Coastal Highway Act, creating highway district, *held*
not unconstitutional as being a special law, in view of amendment
of Februray 18, 1905 (24 St. at Large, p. 830), authorizing spe-
cial laws for road improvement.

25. STATUTES.—Special act authorizing county or other political sub-
division to issue bonds is not within constitutional prohibition of
special legislation.

26. TAXATION.—Coastal Highway Act *held* not unconstitutional for
improper delegation of power of taxation, there being no delegation
of power to tax, but direct action on part of General Assembly.

27. HIGHWAYS.—Coastal Highway Act *held* not in violation of Const.,
Art. 4, § 24, in requiring state officers to perform duties in con-
nection with district.

Original proceeding by M. T. Evans and others against
A. J. Beattie, Comptroller General, and others to enjoin
the respondents from carrying out any of the provisions
of the Coastal Highway Act.   Petition dismissed.

*Messrs. McColl & Stevenson,* for petitioners.

*Messrs. Wilcox & Hardee,* for respondents.

October 15, 1926.

The opinion of the Court was delivered by MR. JUSTICE
COTHRAN.

This is an application by certain taxpayers, residents of
the county of Florence, in the original jurisdiction of this
Court, to enjoin the respondents, the comptroller general
and state treasurer, the chief highway commissioner, the
state highway commission, and the board of coastal high-
way commissioners (appointed under the act), from carry-
ing out any of the provisions of the act approved March
12, 1926, commonly known as the "Coastal Highway Act"
(34 Stat., 1492) ; particularly, to enjoin them from using
for the purposes described in the act any of the gasoline tax
or automobile license tax collected pursuant to the act ap-
proved March 21, 1924 (33 Stat., 1193), commonly known
as the "Pay-As-You-Go" Act, from levying any tax upon

the property of the petitioners, and from issuing any bonds of the coastal highway district or of the counties embraced in that district, pursuant to the terms of the Coastal Highway Act. It is also sought to have this Court declare invalid the Coastal Highway Act and certain provisions of the Pay-As-You-Go Act.

Upon presentation of the petition, his Honor, Associate Justice Blease, of this Court, issued an order requiring the respondents to show cause to this Court, on June 14, 1926, why the injunction prayed for should not be issued. The respondents have made written return to this order, in which they admit the allegations of fact contained in the petition and deny certain conclusions of law set forth therein. The matter is now before us for decision upon the petition and return and upon exceedingly full and illuminating briefs of counsel, which demonstrate the fact that this is not a "friendly suit" to insure the validation of the Coastal Highway Act, but a genuine and earnest contest over the provisions of that act; as counsel for the petitioners very aptly describe the situation:

"Here the citizen's claim of fundamental right under government, is to be weighed against the claim of lawful community enterprise and development. The grave issue ought to compel care and dignity in presentation as the only fitting aid to true and just judgment."

In that spirit we approach the discussion and decision of the many points involved.

The act under review is closely connected with the Act of 1924, the "Pay-As-You-Go" Act, a brief reference to which may be made. That act establishes a state highway system, consisting of certain highways in each county of the state, described therein, and provides that these highways shall be construed and maintained by the state highway department by means of funds provided by the act, consisting of the automobile license tax, three-fifths of the five-cent gasoline tax, and all federal aid moneys. The

statute directs the state highway department to construct the highways designated in the statute as hard-surface roads, at an average cost not exceeding $30,000 per mile in any one year, provides that no county shall have constructed two hard-surface cross county roads until every other county in the state has one hard-surface road across the county, and declares that the construction of the roads designated in the statute shall be carried on simultaneously in each judicial circuit. The act also provides for reimbursing counties on account of hard-surface roads constructed by the counties before the passage of the act. Furthermore, it authorizes the state highway commission to enter into an agreement with any county or counties whereby the county or counties will be permitted to construct any of the state highways, and the state highway commission will agree to reimburse or repay the county or counties in the manner provided by the third section of the act for reimbursement to counties for roads constructed before the passage of the act. Connecting up certain highways provided for by the act in the counties of Dillon, Marion, Florence, Williamsburg, Berkeley, Charleston, Colleton, Beaufort and Jasper there is a continuous highway, extending from the North Carolina line, the border of Dillon County, to the Georgia line the border of Beaufort County, at the Savannah River bridge. Considered as a continuous line, this highway is a part of a national highway extending from Canada to Southern Florida, the portion in South Carolina being referred to as the "coastal highway."

Under the Act of 1924 (33 Stat., 1193), amended by Act of 1925 (34 Stat., 51), two alternative plans were authorized for the construction of the highways designated therein: (1) By the state highway commission, by means of funds provided by the act, consisting of the automobile license tax, three-fifths of the five-cent gasoline tax (Act of 1925, p. 56, § 11), and all federal aid moneys, within a

period to be determined by the commission, and which has been estimated at 18 years, beginning January 1, 1924; (2) By the several counties, by permission of the state highway commission, and under a reimbursement agreement with the commission by which the value to the state of such construction shall be refunded to the county out of the funds made available by the act, in equal annual installments, during the estimated period of construction.

It is provided in the act:

"That no agreement for the reimbursement shall be made which shall necessitate the payment to said county or counties of a sum annually greater than said county or counties would receive if said hard-surfaced roads had not been constructed."

Prior to or during the session of the General Assembly in January, 1926, several of the counties through which this continuous line, called the coastal highway, extended, conceived the idea of establishing a highway district, composed of the 10 counties affected, for the purpose of accomplishing the immediate construction of the continuous highway by a method substantially the same as the reimbursement plan set forth in the act of 1924 (referred to above as the second alternative plan under that act), rather than await the slower process of construction by the state highway commission, under the first plan above referred to, in the Act of 1924. Four of the counties affected, however, declined to co-operate with the other six counties in the movement suggested; Marion, Berkeley, Charleston, and Hampton preferring to proceed independently under the Act of 1924, leaving it to the state highway commission to proceed upon the first plan above outlined or to the several counties under the second plan, the reimbursement plan, or to independent legislative action affecting one or more of them.

At the session of 1926 (34 Stat. at Large, p. 1449), an act was passed creating a highway district, known as the

middle coastal highway district, composed of the counties of Charleston and Berkeley, for the purpose of constructing those portions of the continuous line, the coastal highway, as were located in those two counties, upon a plan exactly the same as is provided in the Coastal Highway Act, hereinafter considered. Marion County, which is traversed by about 11 miles of the coastal highway as stated, also declined to co-operate with the other six counties, and, no legislation has been passed affecting it, leaving it free to act under one or the other of the alternative plans provided in the act of 1924. Hampton county, which is traversed by about 12 miles of the coastal highway as stated, also declined to co-operate with the other six counties, and no legislation has been passed affecting it. The portion of the coastal highway located in Hampton county is not one of the highways defined in the act of 1924, and its construction is left to future legislation.

It may be assumed that, unless prevented by adverse judicial action, the lines in Charleston and Berkeley counties will be constructed in the near future under the Middle Coastal Highway Act, and that the line in Marion county will in time be constructed under one or the other of the alternative plans provided in the act of 1924. The line in Hampton county will await legislative action. The six counties, Dillon, Florence, Williamsburg, Colleton, Jasper, and Beaufort, left without the co-operation of the other four counties, Marion, Berkeley, Charleston, and Hampton, procured the passage of an act, at the session of 1926, known as the Coastal Highway Act (34 Stat. 1492), which is the act under attack in this proceeding. It contains the following provisions:

(1) The territory embraced within the six counties named above is constituted a highway district and political subdivision of the State, and the inhabitants thereof are constituted a body politic and corporate, under the name of the coastal highway district, and may sue and be sued.

(2)  The powers and duties of the corporation are de-
volved upon a "board of coastal highway commissioners,"
composed of six members, appointed by the Governor, one
for each of the several counties composing the district, and
whose term of office "shall end when their duties under this
act shall have been fully performed."

(3)  The coastal highway district (hereinafter called for
convenience, the "district"), and the State highway commis-
sion (hereinafter called for convenience, the "commission"),
are "authorized and directed" to enter into an agreement
whereby:

(a)  The district shall agree to advance to the commis-
sion the moneys necessary to construct the highways de-
scribed in the act, which are the portions of the continuous
line, the coastal highway, located in the several six counties
named, excluding the portions located in the several four
counties, non-co-operating, and including three offshoots or
spurs, one extending from the town of Dillon to the town
of Little Rock, 5 miles; another from the town of Dillon to
the town or village of Lake View, 5 miles; and a third
from the town of Pocotaligo, in Beaufort county, to the
city of Beaufort, 23 miles.

(b)  The commission shall agree to construct said high-
ways.

(c)  The commission shall agree "to reimburse and
repay said district for the moneys so advanced, in the same
manner as is provided by sections 3 and 6 of the Act of
1924," the "Pay-As-You-Go" Act, "except as herein other-
wise provided." (The plan of reimbursement agreements
is above outlined.) The reimbursement plan, under the
Act of 1924, is modified by the Act of 1926 in these par-
ticulars: (1) Under the Act of 1924, the reimbursement is
directed to be made in equal annual installments during the
period estimated by the commission to be necessary for the
completion of the work of construction; under the Act of
1926 the reimbursement is directed to be made in equal

annual installments during the period "beginning not more than one year after the completion of said highways and ending not more than 12 years after the date of said agreement." (2) Under the Act of 1924 the reimbursement is to be made upon the basis of the value to the State of the constructed highway, as of the date of its completion; under the Act of 1926, it is to be made upon the basis of the amount of money advanced by the district under the agreement with the commission as of the dates of the completion of the highways.

(4) The commission shall reimburse and repay the district for the moneys advanced by it out of the funds authorized by the Act of 1924, which are the automobile license tax, three-fifths of the gasoline tax, and money received from the federal government in aid of public highways. It of course is subject to the limitation in the Act of 1924, above set forth:

"That no agreement for the reimbursement shall be made which shall necessitate the payment to said county or counties of a sum annually greater than said county or counties would receive if said hard-surfaced roads had not been constructed."

The moneys required to be paid to the district by the commission under such reimbursement agreement, and all moneys received by the commission as interest on deposits of moneys advanced to the commission by the district, are directed to be paid to the state treasurer, to be held by him on behalf of the district and applied to the payment of bonds or notes, as directed by the act.

(5) A pledge of so much of the funds arising from the automobile licenses, gasoline tax, and federal aid (and of course under the foregoing limitation applicable to the particular project), as may be necessary for the purpose of making such reimubrsement, "except moneys needed in order to carry out valid reimbursement agreements heretofore entered into pursuant to said act." Which pledge "is hereby

made a part of the contract between said district and the holders of the bonds or notes hereinafter referred to."

(6) That after the reimbursement agreement shall have been made, the commission shall have the right to demand of the district a specified sum of money, estimated to be necessary within the next eight months, for the construction of highways, pursuant to the agreement; that thereupon the board of coastal highway commissioners shall issue negotiable bonds of the district, in an amount equal to the sum so specified, the proceeds of which, after disposition of the bonds as directed in the act, shall be received by the state treasurer and placed to the credit and order of the commission. (The terms, execution, and mode of sale of the bonds are particularly defined in the act, the details of which do not concern the present controversy.)

(7) The state treasurer is authorized at any time within two months of maturity of interest or principal to borrow on the credit of the district, by one-year notes, enough to pay same; also before completion of the highway he may at any time borrow on two-year notes on the credit of the district enough money to pay interest on the bonds.

(8) The levy of an annual *ad valorem* tax upon all taxable property in the district sufficient to pay the principal and interest upon bonds issued under the act, as such principal and interest become due. The tax shall be levied by the comptroller general, collected by the county treasurers of the several counties in the district, at the same time and in the same manner as state taxes are levied and collected, and paid to the state treasurer.

(9) The moneys paid to the state treasurer shall be applied as follows:

(a) The annual *ad valorem* tax, to the payment of the principal and interest upon the bonds as they become due.

(b) The amount received by the state treasurer from the commission, by way of reimbursement to the district, to the payment of the principal of the bonds and to the prin-

cipal of notes issued for said purpose, and to the reduction of the property tax.

(c) That portion of the gasoline tax, two cents per gallon, directed by Section 11 of the Act of 1924, as amended by the Act of 1925, to be distributed to the counties in the district, "the payment of the interest on the bonds and notes and to the payment of the principal of notes issued for the purpose of paying said interest and to the reduction of said property tax."

(d) Interest on deposits, to be applied as in subdivision (c).

(e) All other moneys received pursuant to the act and not specifically required or authorized by the act to be applied to some other purpose shall be applied as in subdivision (c).

(10) All bonds and notes issued under the act shall be "direct and general obligations of said district, payable primarily from said property tax, which, however, shall be reduced as hereinbefore provided."

(11) All bonds and notes issued under the act shall be exempt from all state, county, municipal and school taxes in this state.

(12) In Section 12a of the act it is provided that at the option of the board of coastal highway commissioners, the reimbursement agreement between the commission and the district may be made between the commission and the six counties named, so that the six counties, acting by the board, shall jointly agree to advance the moneys necessary to construct the highway, and the commission shall agree to reimburse said counties for the money so advanced, with like effect as if the agreement had been made between the commission and the district.

(13) Provision is made for the expenses of the board of coastal highway commissioners.

(14) Provision is made for condemnation of necessary rights of way.

(15) Marion County exempted from the provisions of the act.

· The taxation authorized by the act is not referable, as general taxes, to the power of the state by an equal and uniform method, to tax all property for a public purpose. It is, on the contrary, the exercise by the Legislature of the assumed right to carve out of the territory of the state a special district, and to order in the form of a tax upon all property in that district a special assessment for local improvements.

In the case of *Browning v. Hooper,* 269 U. S., 396; 46 S. Ct., 141; 70 L. Ed., 330, decided January 4, 1926, the · Court said:

"Here, on the initiation of individuals signing the petition, a special district was carved out to furnish credit and to pay for specified improvements on designated roads wholly within the territory selected. The purpose was special, and the district will cease to exist as a body corporate upon the payment of the bond debt. It is clear that the burdens here sought to be imposed on appellants' lands are special assessments for local improvements, *Embree v. Kansas City & L. B. Road Dist.,* 240 U. S., 242, 247, 627; 36 S. Ct., 317; 60 L. Ed., 624. *Illinois C. R. Co. v. Decatur,* 147 U. S., 190, 197, 209; 13 S. Ct., 293; 37 L. Ed., 132, 134, 138." ·

In *Railway Co. v. Decatur,* 147 U. S., 197; 13 S. Ct., 294 (37 L. Ed., 132), the Court draws the distinction between general taxes and special assessments in a very clear and forcible manner. In reference to special assessments it is said:

"On the other hand, special assessments or special taxes proceed upon the theory that when a local improvement enhances the value of neighboring property that property should pay for the improvement."

And in reference to general taxes:

"Taxes proper, or general taxes, proceed upon the theory that the existence of government is a necessity; that it cannot continue without means to pay its expenses; that for those means it has the right to compel all citizens and

property within its limits to contribute; and that for such contribution it renders no return of special benefit to any property, but only secures to the citizen that general benefit which results from protection to his person and property, and the promotion of those various schemes which have for their object the welfare of all. 'The public revenues are a portion that each subject gives of his property in order to secure or enjoy the remainder.' "

In *Jackson v. Breeland*, 103 S. C., 184; 88 S. E., 128, the Court said:

"The distinction between taxes and assessments is so well settled on principle and authority that citation of cases is scarcely necessary. * * * It is very true that in popular parlance, and even in legislative enactments, assessments are frequently called taxes, but Courts will look behind mere words to find the real meaning. Taxes, in the strict sense of the word, are imposed upon all property, both real and personal, for the maintenance of the government or some division thereof, while assessments are laid only on the property to be benefited by the proposed improvements."

Looking to the terms of the act, it is clear that the legislative intent that the tax levied should be considered a special assessment and not a general tax is demonstrated:

"Inasmuch as the highways above described, together with certain other sections of highway situated in the counties of Marion, Berkeley, Charleston and Hampton, constitute a continuous highway, commonly known as the coastal highway running across the state of South Carolina from North Carolina to Georgia, through all of the counties in the highway district hereby established, with a branch highway running from said highway to the town of Beaufort, it is hereby determined that the construction of the highways above described will be of special benefit to all property owners in the said highway district."

It is contended by the petitioners that the tax, being a special assessment, cannot under the Constitution of this state and the decisions of this Court be provided for by legislative action, in the absence of constitutional authority therefor. The cases of *Jackson v. Breeland,* 103 S. C., 184; 88 S. E., 128, and *Mauldin v. Greenville,* 53 S. C., 293; 31 S. E., 252; 43 L. R. A., 101; 69 Am. St. Rep., 855, are cited to sustain this contention.

In *Jacskson v. Breeland,* the validity of the general drainage law, Sections 3150 and following of Volume 3, Code of 1922, was at stake. This law was passed pursuant to the amendment of 1901 to the Constitution of 1895, providing:

"The General Assembly shall provide by law for the condemnation, through proper official channels, of all lands necessary for the proper drainage of the swamp and low lands of this state, and shall provide for the equitable assessment of all lands so drained, for the purpose of paying the expenses of such condemnation and drainage."

(Note.—This amendment does not appear in the Constitution reproduced in Volume 1, Code of 1922, but may be found at page 656 of Volume 2, Code of 1912.)

The law was sustained as a proper exercise of the constitutional power conferred by the amendment. The Court however, made the following declaration, upon which the petitioners rely to sustain the above contention:

"I am clearly of the opinion, and so hold, that the validity of the drainage laws depends upon the amendment to the Constitution."

From this the petitioners rely upon the implication that but for the amendment the Legislature would have been without power to pass the drainage law, which is doubtless a legitimate inference; but the question was not at issue in that appeal and the remark, while that of a distinguished circuit Judge (Judge Prince), whose decree was adopted in *toto* by this Court, is clearly an *obiter dictum.*

In the *Mauldin case,* the question at issue was whether, under the Constitution, the city of Greenville had the power to pass an ordinance, pursuant to an act of the General Assembly, assessing abutting property owners for the cost of sidewalks and drains laid in the streets of the city. The power was denied upon the ground that under Article 10, § 5 of the Constitution the municipality had the power only of levying taxes for corporate purposes—that is, for general revenue or governmental purposes, which must of course be levied upon all of the property within the city. *Arguendo,* the Court compares the power claimed to that of the General Assembly in the matter of levying state taxes, and declares:

"It is admitted that an effort is made by some persons to justify the imposition of a special assessment, as they are called, by claiming that such assessments are made for specific divisions of corporate territory, * * * but it is enough for our purpose to say that in our Constitution no power is given to the General Assembly to carve the territory of the state into special tax districts for state taxation except into counties, townships, school districts, cities, town and villages."

From which the petitioners argue that the General Assembly has no power under the Constitution to carve the territory of the state into special tax districts, for any purpose; clearly a *non sequitur;* a matter really that was not involved in the *Mauldin case* at all. The contention of the petitioners is that, as the Constitution provides in Article 10, § 5: "The corporate authorities of counties, township, school districts, cities, towns and villages may be vested with power to assess and collect taxes for corporate purposes; such taxes to be uniform in respect to persons and property within the jurisdiction of the body imposing the same—" such grant of power to the General Assembly is exclusive and precludes it from vesting the power in special tax districts, bridge, drainage or highway, to levy special assessments for improvements, or the General Assembly itself from

creating such special districts and itself levying special assessments for improvements.

Discussing Article 10, § 5, of the Constitution, in the *Jackson v. Breeland case,* the Court says:

"Construing this section as a whole, it is perfectly apparent that the bonded indebtedness therein referred to means indebtedness contracted for corporate purposes pursuant to law and to be paid out of taxes to be levied upon all the property within the corporate boundaries. It is further apparent that the bonded indebtedness therein referred to has no connection whatever with the assessment of property for local improvement, and the authority of a drainage district to levy and collect assessments for the drainage of swamp and lowlands, and the issuance of so-called bonds therein is not derived from this section of the Constitution or affected thereby."

So it may be said with equal truth that the authority of the General Assembly to direct the levy of assessments for the construction of a highway in a specially created district, and the issuance of bonds therein, "is not derived from this section of the Constitution or affected thereby." The real question at issue is whetehr the *obiter dictum* in the *Jackson Breeland case,* containing the implication that the drainage law could not have been sustained but for the amendment of 1901, shall be so far followed as to hold that in the absence of constitutional authority a special tax district for bridges or highways cannot be created, with the power of special assessments for the desired improvement.

It follows logically from the ruling in the *Jackson v. Breeland case,* to the effect that the power to create a special drainage district, and the authority to levy special assessments for such improvements, were not referable to the provisions of Article 10, § 5, that they may be referred to the amendment of 1901, and that if that was not essential, to the general legislative power of the General Assembly. It does not necessarily follow from the fact that the amend-

ment of 1901 gave the General Assembly the authority to
pass the general drainage act that the authority to do so
was not already within its general legislative powers; and
so the power to create a special highway district and to pro-
vide for special assessments for such improvements may be
among such general powers.

The power, as inherent among the general legislative
powers of the General Assembly, is based upon the prin-
ciple that a state Constitution is not a grant but a limitation
upon legislative powers.    The idea is clearly expressed in
the case of *State v. Dodge,* 8 Neb., 124; 30 Am., Rep., 819:

"The authority of the Legislature to vest cities, towns
and villages with power to make local improvements by
special taxation of property benefited is not a grant of power.
The authority already existed, and the Constitution merely
prescribes the rule by which taxes shall be appointed.    How
then can it be claimed that the enumeration of cities, towns
and villages excludes all other municipal corporation?  If the
Constitution was a grant of power, the rule contended for
would be correct. But not being a grant of power, and the
Legislature possessing authority, in the absence of an in-
hibition in the Construction to pass the act in question,
it is not obnoxious to Section 6, Art. 9, of the Consti-
tution.    And this is the rule laid down in the case of
*State v. Lancaster County,* 4 Neb., 540 [19 Am. Rep.,
641], where it is said:  'The Constitution of a state, ac-
cording to the rule which seems to be well settled, is not
regarded as a grant but rather as a restriction of leg-
islative power; and so in an inquiry as to whether a statute
is constitutional, it is for those who question its validity
to show that it is prohibited.'   In that case it was held that
the taxing power of the Legislature was not limited, in the
absence of positive restrictions in the Constitution, to the
objects and classes of business enumerated in that instru-
ment.   We adhere to that decision, and it is decisive in this
case."

In *Hansen v. Hammer*, 15 Wash., 315; 46 P., 332, the constitutionality of an act creating a diking district and the special assessment on the property benefited was in question. The Constitution provided:

"That the Legislature may vest the corporate authorities of cities, towns and villages with power to make local improvements by special assessment or by special taxation of property benefited." Const. Wash., Art. 7, § 9.

The contention was that the specific grant prohibited the grant of such power to any other corporation than cities, towns, and villages. The contention was overruled by the Court holding that the grant was not exclusive.

"The act empowering the South park commissioners of Cook county to make a special assessment upon lands is not a violation of Const., Art. 9, § 9, vesting the opwer in the corporate authorities of cities, towns, and villages." *Dunham v. People*, 96 Ill., 331.

In 4 Dillon Mun. Corp. (5th Ed.), § 1431 ([4th Ed.] § 752), quoted with approval in *French v. Barber Co.*, 181 U. S., 324; 21 S. Ct., 625; 45 L. Ed., 879, it is said:

"The courts are very generally agreed that the authority to require the property specially benefited to bear the expense of local improvements, is a branch of the taxing power, or included within it, and the many cases which have been decided fully establish the general proposition that a statute authorizing the municipal authorities to open or establish streets, or to make local improvements of the character above mentioned and to assess the expense upon the property which in the opinion of the designated tribunal or officers shall be specially benefited by such street or improvement in proportion to the amount of such benefit, or upon the abutters in proportion to benefits or frontage or superficial contents, is in the absence of some special constitutional restriction, a valid exercise of the power of taxation."

In *Webster v. Fargo*, 181 U. S., 394; 21 S. Ct., 623; 45 L. Ed., 912, it is said:

"It is within the power of the Legislature of the state to create special taxing districts, and to charge the cost of a local improvement, in whole or in part, upon the property in said district, either according to valuation or superficial area or frontage."

In *Taylor Dist. v. Winslow*, 317 Ill., 25; 147 N. E., 401, it was held:

"The Constitution of the state is not to be regarded as a grant of power, * * * but rather as a limitation upon its power. All legislative power is vested in the General Assembly, subject to the restrictions contained in the Constitution. Every subject within the scope of civil government, which is not withdrawn from the authority of the Legislature, may be acted upon by. it."

It was accordingly held that although the Constitution authorized the General Assembly to "vest the corporate authorities of cities, towns, and villages with power to make local improvements by special assessment" or by special taxation of contiguous property or otherwise, and also authorized the creation of special drainage districts with similar powers, such provisions did not exhaust the general legislative powers of the General Assembly by implication, so as to prevent the creation of a special sanitary district by the General Assembly with similar powers.

"As a result of the decisions of the United States Supreme Court, it may be regarded as definitely settled that the Legislature of a state may create or authorize the creation of special taxing districts and charge the cost of a local improvement, in whole or in part, upon the property in such districts according to valuation or superficial area or frontage, without violating the Fourteenth Amendment to the federal Constitution." 4 Dillon M. C. (5th Ed.), § 1436.

The construction of the Constitution opposed to the contention of the petitioners has been adopted by the General Assembly in the enactment of numerous statutes; its construction is entitled to weight and in doubt-

ful cases should be followed. *McDowell v. Burnett,* 92
S. C., 469; 75 S. E., 873; *Bradford v. Richardson,* 111 S.
C., 205; 97 S. E., 58; *Thompson v. Livingston,* 116 S. C.,
412; 107 S. E., 581. Among such enactments may be men-
tioned the following:

"31 Stats., 1409. This act incorporated the Santee bridge
district, comprising the territory of Charleston, Berkeley and
Williamsburg counties, authorized the district to issue its
bonds, and directed the comptroller general to levy and the
county treasurers of the constituent counties to collect an an-
nual tax to pay the bonds, such tax to be levied *ad valorem*
at an equal rate on all taxable property in the district. The
district issued $50,000 of bonds pursuant to this statute.

"33 Stats.. 1593. This act incorporated the Clarendon &
Orangeburg bridge district, comprising the territory em-
braced in Clarendon and Orangeburg counties, authorized
the district to issue its bonds (in the name of the district,
not in the names of the two counties) in an amount not ex-
ceeding $180,000, and authorized the raising of $90,000 by
taxation in each county to pay the bonds, such tax to be
levied *ad valorem* by the comptroller general and collected
by the county treasurers. The constitutionality of this act
was upheld in *Bagnal v. Clarendon & Orangeburg Bridge
District,* 131 S. C., 109; 126 S. E., 644, as against the ob-
jection that the tax was not uniform in the entire territory
of the district.

"33 Stats., 1786. This act created the Marlboro bridge
district, comprising the territory of six school districts in
Marlboro county, authorized the bridge district to issue its
bonds in an amount not exceeding $150,000, and directed
that the proceeds be used for the purpose of paying 77 per
cent. of the expenses of building a bridge across the Pee Dee
river, the other 23 per cent. to be paid by two townships in
Darlington county. The act also directed the county auditor
of Marlboro county to levy and the county treasurer to col-
lect an annual tax on all taxable property in the district for

the purpose of paying the bonds, in the event that the tolls provided for by the act should not be sufficient for that purpose. These bonds have been issued. By 34 Stats., 1629, this bridge district was authorized to issue additional bonds of the district, payable in the same manner as those above referred to.

"34 Stats., 1552. This act created the Little Pee Dee bridge board, composed of the county commissioners of the counties of Horry and Marion, authorized the bridge board to contract and be contracted within its own name, authorized it to issue its notes in an amount not exceeding $75,000 for the purpose of building a bridge, and provided that in the event that the tolls refered to in the act should be insufficient to pay the notes, the bridge board should certify that fact every year to the auditors of the two counties, and that the auditor of each county should levy on all taxable property in his county a sufficient tax to pay the notes, which tax should be collected by the county treasurer."

The foregoing discussion is based upon the assumption that the act attempted to confer taxing power upon the district or the corporate authorities thereof. As a matter of fact this assumption is not true. The tax provided for in the statute was levied by the Legislature itself. The Legislature is not forbidden by Section 5 of Article 10, or by any other provision in the Constitution from levying directly a tax upon a political subdivision. The act provides as follows (section 11):

"Except as is otherwise provided in this section and in Section 10 there shall be levied on all taxable property in the coastal highway district an annual tax *ad valorem* sufficient to pay the principal and interest of all bonds and notes issued under this act as such principal and interest become due. The said tax shall be annually levied by the comptroller general of South Carolina and collected by the county treasurers of the several counties in said district, at the same time and in the same manner that state taxes are levied and collected.

each of said county treasurers shall collect the tax in his county and pay the same to the state provided by law for the payment of state taxes to the state treasurer." 34 St. at Large, p. 1499.

It will be noted that the board is given no powers in relation to this tax. The statute says a tax "shall be annually levied by the Comptroller General," but his duties are purely ministerial. This being so, the tax is really levied by the General Assembly itself. This is shown by the decision in *Morton, Bliss & Co. v. Comptroller General,* 4 S. C., 430. *Railway Co. v. Kay,* 62 S. C., 28; 39 S. E., 785. *Dickson v. Burckmyer,* 67 S. C., 526; 46 S. E., 343. *Rice v. Shealy,* 71 S. C., 161; 50 S. E., 868.

It cannot be doubted that the Legislature has the power to make the levy itself. In support of this proposition, besides the cases last cited, we call attention to *State v. Whitesides,* 30 S. C., 579; 9 S. E., 661; 3 L. R. A., 777. *Smith v. Walker,* 74 S. C., 526; 54 S. E., 779. *Lillard v. Melton,* 103 S. C., 10; 87 S. E., 421. *Bagnall v. Clarendon & Orangeburg Bridge District,* 131 S. C., 109; 126 S. E., 644. County taxes have been levied annually by the Legislature itself for many years.

In *Bagnall v. Bridge District,* 131 S. C., 109; 126 S. E., 644, the Court (Mr. Acting Associate Justice W. C. Cothran delivering the opinion) said, with reference to the tax provisions of the Act creating the Clarendon & Orangeburg Bridge District, which are the same as the taxing provisions of the Coastal Highway District, except that the tax in the Coastal Highway District is to be levied at an equal rate on all taxable property in the district, whereas in the other district each of the two constituent counties is to pay one-half of the debt by means of a tax to be levied uniformly in each county but not uniformly in the district as a whole:

"Section 7 of the act provides for the levying of the necessary taxes for this purpose, in that the same shall be levied and collected 'in the same manner that state and county

taxes shall be levied and collected.' The comptroller general is given power and authority relative to taxes due by the bridge district of similar nature to his other duties as to state and county taxes. It will thus be noticed that the bridge commissioners have no duties to perform relative to the levy and collection of the necessary taxes to take care of the bond issue. These duties are given solely to the comptroller general and the county officers. Under these condition, there is no difference between the levy and collection of the bridge district tax and the ordinary State and County tax levied and collected each year by the State and County authorities."

We think it is clear therefore, that the Coastal Highway Act is the exercise of the power of the General Assembly to impose a special assessment for local improvements and not a general tax for public purposes, and that this power is derived from the general legislative powers of the General Assembly, not restricted by any constitutional provisions or by the absence of special constitutional authority. The question then is whether the act is a proper exercise by the General Assembly of the power vested in it.

Many objections are urged by the petitioners in their attack upon the Act. Their contentions may be thus summarized:

*That the Act is in violation of the due process and equal protection clauses of the Federal and State Constitutions* (a) in not providing for a hearing from the taxpayers upon the amount of the assessment; (b) that the legislative determination that the construction of the proposed highway was for the benefit of all the property owners in the highway district is plainly arbitrary and an abuse of power.

It is settled by an unbroken line of decisions by the Supreme Court of the United States that where the creation of a special tax district is within the constitutional power of the Legislature of a State and by an Act it defines the district, fixes the basis of taxation or assess-

ment, and declares that the improvements authorized are for the benefit of property owners within the tax district, the question of the necessity of notice is concluded. *Valley Farms v. Westchester Co.,* 261 U. S., 155; 43 S. Ct., 261; 67 L. Ed., 585. *Breiholz v. Board,* 257 U. S., 118; 42 S. Ct., 13; 66 L. Ed., 159. *Hancock v. Muskogee,* 250 U. S., 454; 39 S. Ct., 528; 63 L. Ed., 1081. *Withnell v. Rueck-ing,* 249 U. S., 63; 39 S. Ct., 200; 63 L. Ed., 479. *Embree v. Kansas City,* 240 U. S., 242; 36 S. Ct., 317; 60 L. Ed., 624, and cases cited in those cases.

But, assuming that the Legislature possesses the power to create the special tax district, to define its bond, to fix the basis of taxation, and to declare the benefits, precluding the necessity of notice, as is declared in the case of *Hancock v. Muskogee,* 250 U. S., 454; 39 S. Ct., 528; 63 L. Ed., 1081:

"The question of distributing or apportioning the burden of the cost among the particular property owners is another matter."

As to that the Court says:

"And it is settled by the cases above cited that whether the entire amount or a part only of the cost of a local improvement shall be imposed as a special tax upon the property benefited, and whether the tax shall be distributed upon a consideration of the particular benefit to particular lots or apportioned according to their frontage upon the streets, their values, or their area, is a matter of legislative discretion, subject, of course, to judicial relief in cases of actual abuse of power or of substantial error in executing it, neither of which is here asserted."

Or, as expressed in the case of *Houck v. District,* 239 U. S., 254; 36 S. Ct., 58; 60 L. Ed., 266, the levying of special assessments for local improvements will not be held to deny due process or equal protection of the law unless it can be said that the levy is "palpably arbitrary and a plain abuse"; or in the language of the Court in *Branson v. Bush,* 251 U.

S., 182; 40 S. Ct., 113; 64 L. Ed., 215, it is a "flagrant abuse, and by reason of its arbitrary character is mere confiscation of particular property"; or in *Thomas v. R. C.,* 261 U. S., 481; 43 S. Ct., 440; 67 L. Ed., 758, it is "an instance of discrimination so palpable and arbitrary as to amount to a denal of equal protection of the law."

In *Gast Realty Co. v. Schneider,* 240 U. S., 55; 36 S. Ct., 254; 60 L. Ed., 523, the Court said:

"The Legislature may create taxing districts to meet the expense of local improvements and may fix the basis of taxation without encountering the Fourteenth Amendment unless its action is palpably arbitrary or a plain abuse."

The petitioners contend that the tax or assessment in question falls within the descriptions we have quoted. In support of this contention the petitioners point out that the Coastal Highway District is composed of three widely separated divisions of territory, one division being composed of Dillon County, the second of Florence and Williamsburg Counties, and the third of Colleton, Beaufort, and Jasper Counties. They argue that it is physically impossible to construct a continuous highway through such a district, and it, therefore, cannot be said that the highways in question will be of special benefit to all property owners in the district. In making this contention the petitioners overlook the fact that the Coastal Highway is in actual existence and use, and running continuously from North Carolina to Georgia through the Coastal Highway District; that the other highways in the district, which are to be hard-surfaced under the Coastal Highway Act, connect with this continuous highway; and that the hard-surfacing of any or all portions of the continuous highway or the branch highways will be of special benefit to all property owners in the district. Every foot of these highways embraced in the State Highway System, if not already hard-surfaced, will be hard-surfaced by the State Highway Department by January 1, 1942, under the provisions of the Pay-As-You-Go Act. It cannot be

doubted that when the Coastal Highway and the branch highways are completely hard-surfaced, they will be of special benefit to all property owners in the Coastal Highway District. In that event, the benefits would be greater than if only portions of the highways were hard-surfaced, but the benefit results to the whole territory from the improvement of any portion of the continuous highway or its branches.

The petitioners call special attention to the branch highways in Dillon County, which they describe as two spurs, one leading "to the little village of Little Rock," and the other "to a country settlement known as Lake View." They fail to point out that these two so-called spurs constitute a part of an important interstate highway, running through the county seat of Dillon County and intersecting the coastal highway. A taxpayer of any county in the district traveling to any point on that interstate highway will derive special benefits from the hard-surfacing of the 10 miles of that highway described in the Costal Highway Act. By the same reasoning, the other so-called spur roads will be of special benefit to all property owners in the district.

The petitioners also argue that there is property outside of the district which, though exempt from the burden, will derive the same benefits as property within the district. A similar argument was made in *House v. Road Improvement District*, 266 U. S., 175; 45 S. Ct., 60; 69 L. Ed., 229, relating to the constitutionality of a special act creating a road district and providing for the levying of special assessments therein for road purposes. Mr. Justice McReynolds, in the opinion of the Court upholding the statute, said:

"As an additional ground for challenging the statute plaintiff in error claims that it is arbitrary and beyond the power of the Legislature because the proposed improvement could not benefit plaintiff's lands, while other lands actually benefited were not included. The record does not show that this objection was placed upon any federal

ground in the Courts below; but, assuming that the point was properly made, we think it is clearly without merit."

The petitioners also contend that Florence County's share of the *ad valorem* tax or assessment will be out of proportion to the benefits to be received by that county, inasmuch as its share of the tax will be larger than that of any of the other five counties in the district, while other counties will have a larger mileage of highways constructed under the act. The mileage of highways in the county is not the sole measure of benefits to the county. The extent to which the people of the county will use the highways must also be considered. The people of Florence County, being more numerous than the people of any other county in the district, will doubtless make the greatest use of the highways to be improved and thus derive the greatest benefit from the work. The Legislature doubtless considered these and other things in fixing Florence County's share of the burden of the tax or assessment. Upon similar consideration, it imposed upon Charleston County in 1920 a greater proportion of the expense of building the Santee bridge than it imposed upon Williamsburg and Berkeley Counties, although the bridge is entirely outside of Charleston County. 31 Stats., 1409.

Furthermore, the petitioners attack the tax or assessment upon the ground that it is distributed in proportion to the assessed value of the property instead of according to the amount of benefit thereto, and that the benefits in this case will not be received in proportion to the assessed value of the property, because property remote from the road will not receive the same benefits as property within the immediate vicinity of the road. But special assessments for road improvements, levied *ad valorem,* in a road district, have frequently been sustained by the United States Supreme Court as against objections of this kind. *Miss. Pac. R. Co. v. Western Crawford Road Improvement District,* 266 U. S., 187; 45 S. Ct., 31; 69 L. Ed., 237. *Web-*

*ster v. Fargo,* 181 U. S., 394; 21 S. Ct., 623; 45 L. Ed.,
912.   Assessments levied *ad valorem* for various other kinds
of public improvements have also been upheld. *Valley Farms·
Co. v. Westchester,* 261 U. S., 155; 43 S. Ct., 261; 67 L.
Ed., 585.

In *Houck v. Little River Drainage District,* 239 U. S.,
254; 36 S. Ct., 58; 60 L. Ed., 266, the Court upheld a gen-
eral statute providing for the formation of drainage districts
and authorizing the levying of a special assessment on all
lands in the district according to area, *i. e.,* at the rate of 25
cents per acre, for the purpose of defraying the preliminary
expenses of constructing a drainage system.  The opinion of
the Court, by Mr. Justice Hughes, says:

"In view of the nature of this enterprise it is obvious that,
so far ·as the Federal Constitution is concerned, the State
might have defrayed the entire expense out of the State
funds raised by general taxation, or it could have appor-
tioned the burden among the counties in which the lands
were situated and the improvements were to be made. *Mo-
bile County v. Kimball,* 102 U. S., 691, 703, 704; 26 L. Ed.,
238, 241, 242.  It was equally within the power of the State
to create tax districts to meet the authorized outlays. * * *
And with respect to districts thus formed whether by the
Legislature directly or in appropriate proceeding under its
authority, the Legislature may itself fix the basis of taxation
or assessment; that is, it may define the apportionment of
the burden, and its action cannot be assailed under the Four-
teenth Amendment unless it is palpably arbitrary and a
plain abuse.   These principles have been established by re-
peated decisions. * * ·*

"The ultimate contention, then, is that the plaintiffs in
error cannot be subjected to this preliminary tax of 25 cents
an acre because their lands, as they insist, will not be bene-
fited by the plan of drainage.  In authorizing the tax, it is
said, the Legislature has departed from the principle of ben-
efits, and the tax is asserted to be *pro tanto* an uncompen-

sated taking of their property for public use. But the power of taxation should not be confused with the power of eminent domain.  * * * Each have been established by repeated decisions. * * * When local improvements may be deemed to result in special benefits, a further classification may be made and special assessments imposed accordingly; but even in such case there is no requirement of the Federal Constitution that for every payment there must be an equal benefit. The State in its discretion may lay such assessments in proportion to position, frontage, area, market value, or to benefits estimated by commissioners.  * * * And, as we have said, unless the action is a flagrant abuse, and by reason of its arbitrary character is mere confiscation of particular property, it cannot be maintained that the State has exceeded itc taxing power."

In *Miller & Lux v. Sacramento, etc., Drainage District,* 256 U. S., 129; 41 S. Ct., 404; 65 L. Ed., 859, where the Court upheld a statute authorizing the levy of a special assessment in a drainage District according to acreage, Mr. Justice McReynolds said:

"Since *Houck v. Little River Drainage Dist.* (1915), 239 U. S., 254; 36 S. Ct., 58; 60 L. Ed., 266, the doctrine has been definitely settled that in the absence of flagrant abuse of purely arbitrary action a State may establish drainage districts and tax lands therein for local improvements, and that none of such lands may escape liability solely because they will not receive direct benefits."

In *Kansas City Southern Railway Co. v. Road Improvement District,* 266 U. S., 379; 45 S. Ct., 136; 69 L. Ed., 355 a road district was formed under a general statute, a special assessment was levied on land in the district for the purpose of paying the cost of a road, and the special assessment was thereafter confirmed by a special Act of the Legislature. Two railroad companies assailed the assessment and the legislative confirmation thereof, upon the ground that it was purely arbitrary in that the railroad property neither would nor could receive any benefit from the improvement

of the road, and also upon the ground that the railroad property on the one hand and farm lands and town lots on the other were assessed with benefits in grossly unequal proportions to the detriment of the railroad property. In upholding the assessment, the Court said (pages 386-388) :

"By a long line of decisions in this Court it has been settled that, where the State Constitution as construed by the State Court of last resort does not provide otherwise, the Legislature of a State may require that the cost of a local public improvement, such as the construction or reconstruction of a public road, be distributed over the lands particularly benefited and charged against them according to their value, their area or the benefits which they will receive; may itself determine what lands will be benefited and in what proportions they will share in the benefits. * * * Only where the legislative determination is palpably arbitrary, and therefore a plain abuse of power, can it be said to offend the due process of law clause of the Fourteenth Amendment. *Spencer v. Merchant,* 125 U. S., 345; 355-357 [8 S. Ct., 921; 31 L. Ed., 763]; *French v. Barber Asphalt Paving Co.,* 181 U. S., 324; 338, et seq., [21 S. Ct., 625; 45 L. Ed., 879], *Houck v. Little River Drainage District,* 239 U. S., 254; 262, 265 [36 S. Ct., 58; 60 L. Ed., 266]; *Myles Salt Co. v. Iberia Drainage District,* 239 U. S., 478; 481 [36 S. Ct., 204; 60 L. Ed., 392; L. R. A., 1918-E, 190]; *Branson v. Bush,* 251 U. S., 182; 189 [40 S. Ct., 113; 64 L. Ed., 215]; *Valley Farms Co. v. County of Westchester,* 261 U. S., 155; 163 [43 S. Ct., 261; 67 L. Ed., 585]. And only where there is manifest and unreasonable discrimination in fixing the benefits which the several parcels will receive can the legislative determination be said to contravene the equal protection clause of that amendment. *Kansas City Southern Ry. Co. v. Road Improvement District No. 6;* 256 U. S., 658 [41 S. Ct., 604; 65 L. Ed., 1151]; *Thomas v. Kansas City Southern Ry. Co.,* 261 U. S., 481 [43 S. Ct., 440; 67 L. Ed., 758].

"To justify an assessment of benefits to particular lands it is not essential that the benefits be direct or immediate (*Valley Farms Co. v. County of Westchester, supra*); but it is essential that they have a better basis than mere speculation or conjecture (*Kansas City Southern Ry. Co. v. Road Improvement District No. 6, supra*). In the case of railway property they may consist of gains from increased traffic reasonably expected to result from the improvement. *Thomas v. Kansas City Southern Ry. Co., supra; Branson v. Bush, supra.*

"The special confirmatory act was recognized by the Supreme Court of the State as a legislative determination of the lands which will be benefited and of the proportions in which they will share in the benefits. It therefore must be treated here as an admissible legislative assessment of benefits so far as the State Constitution is concerned.

"The evidence, as before outlined, falls short of showing that the assessment against the railway property was either palably arbitrary or unreasonably discriminatory. The burden was on the railway companies to overcome the presumption attending the legislative determination, and this they failed to do; for, under the evidence produced, it is an entirely admissible view that the railway property will be substantially benefited by the road improvement and that the benefits are fairly assessed as between that property and the farm lands and town lots. True, the amount of benefits which will accrue to the railway property is laregly a matter of forecast and estimate; but the same thing is true of the farm lands and town lots, and also of benefit assessments in general. See *Louisville & Nashville R. R. Co. v. Barber Asphalt Paving Co.*, 197 U. S., 430; 433 [25 S. Ct., 466; 49 L. Ed., 819]; *Butters v. Okland*, 263 U. S., 162; 165 [44 S. Ct., 62; 68 L. Ed., 228]. Forecast and estimate based on a solid premise of fact and experience are not to be confused with mere speculation and conjecture."

In *Mobile County v. Kimball*, 102 U. S., 691; 26 L. Ed.,

238, the Court upheld a Statute which imposed upon Mobile County the entire cost of extensive improvements of the river bay and harbor of Mobile, notwithstanding that these improvements benefited the whole State.    In *Williams v. Eggleston*, 170 U. S., 304; 18 S. Ct., 617; 42 L. Ed., 1047, the Court upheld a special Act of Connecticut which created the Connecticut River bridge and highway district, composed of Hartford and four other towns, for the construction and maintenance of a highway across the Connecticut river at Hartford, authorized the issuance of bonds of the district for the purpose of paying the cost of these improvements, and distributed the burden of paying the bonds upon the five towns in various proportions.

In *Milheim v. Moffatt Tunnel District*, 262 U. S., 710; 43 S. Ct., 694; 67 L. Ed., 1194, the Court upheld a special Act creating a tunnel district composed of all or portions of nine counties east and west of the Continental Divide in Colorado, and which authorized the issuance of bonds of the district for the purpose of constructing a tunnel through the Divide. The Court also sustained an *ad valorem* assessment levied on the property in the district pursuant to this Statue.    In *Valley Farms Co. v. Westchester*, 261 U. S., 155; 43 S. Ct., 261; 67 L. Ed., 585, the Court upheld an *ad valorem* assesment levied on all taxable real estate in the so-called Bronx Valley sewer district for the purpose of constructing a trunk and outlet sewer, notwithstanding that some of the property included in the district was separated from the trunk sewer by a high ridge anl could not be connected with the trunk sewer except by means of a connecting line four miles long, which would probably cost $300,000, and which had not yet been even planned.    The Court said:

"All lands within the district ultimately may be connected with some portion of the sewer and we cannot say they derive no benefits therefrom or that any were included arbitrarily or for improper purposes."

In *Branson v. Bush*, 251 U. S., 182; 40 S. Ct., 113; 64 L.

Ed., 215, the Court sustained a special act creating a road district and providing for the levying of a special assessment *ad valorem* on all real estate in the district for the purpose of constructing a road. We call attention to the case of *Gulf Refining Co. v. Phillips*, 11 F. (2d) 967, decided by the the United States Circuit Court of Appeals of the Fifth Circuit, on March 22, 1926, rehearing denied April 22, 1926. It will be noted that this case was decided some time after the decision of the *Archer County case* in the United States Supreme Court. In this case a school district, pursuant to authority conferred by statute, issued bonds for a school building and levied an *ad valorem* tax on all taxable property in the district for the purpose of paying the bonds. It was held that the tax was valid as against oil in tanks awaiting transportation. · The Court said:

"It is not to be questioned that the tax was for a purpose which was beneficial to property and persons located in that district. It was not rendered invalid as to appellant by reason of the fact that it may not have resulted in the same measure of benefit to the appellant or its property as accrued therefrom to other property * * * located in that district. The imposition of the tax did not amount to an arbitrary taking of appellant's property without compensation. There was no such inequality or discrimination as has the effect of rendering a tax invalid. *Dane v. Jackson,* 256 U. S., 589; 41 S. Ct., 566; 65 L. Ed., 1107; *Branson v. Bush,* 251 U. S., 182; 40 S. Ct., 113; 64 L. Ed., 215."

It should be borne in mind that the decision in the *Archer County case* was based, not upon the ground that the Legislature had adopted an arbitrary basis of taxation or assessment, but solely upon the ground that no provision had been made for notice and a hearing on the question of including property in the road district. Several cases are cited by counsel for the petitioners as sustaining a contrary position. In *Gast v. Schneider,* 240 U. S., 55; 36 S. Ct., 254; 60 L. Ed., 523, the ordinance was rejected upon the

ground that it distributed "a local tax in grossly unequal proportions," which cannot be said of assessments upon all of the property within a tax district according to its value. In *Myles v. District,* 239 U. S., 478; 36 S. Ct., 204; 60 L. Ed., 392; L. R. A., 1918-E, 190, an attempt was to assert a drainage tax upon a tract of table land, elevated 175 feet above the sea level, which could not possibly receive any benefit from the drainage improvement.

"In the absence of any more specific constitutional restriction than the general prohibition against taking property without due process of law, the Legislature of the state, having the power to fix the sum necessary to be levied for the expense of a public improvement, and to order it to be assessed, either like other taxes, upon property generally, or only upon the lands benefited by the improvement, is authorized to determine both the amount of the whole tax, and the class of lands which will receive the benefit and should therefore bear the burden." *Wagner v. Baltimore,* 239 U. S., 207; 36 S. Ct., 66; 60 L. Ed., 230.

> *That the act is in violation of article* 10, § 5, *of the State Consitution, which prescribes a limitation upon the bonded debt of certain political subdivisions of the State.*

It is specifically held in the case of *Jackson v. Breeland,* 103 S. C., 184; 88 S. E., 128, as has been hereinbefore stated, that the power of the General Assembly to create special tax districts for local improvements is not derived from Article 10, § 5, of the Constitution, and is not affected thereby. This is in line with the current of authorities upon the subject.

"The imposition of an assessment of the expenses of a local improvement, upon adjoining lands benefited by it, although an exercise of the taxing power, is not taxation within provisions of a State Constitution regulating or prescribing the manner of taxation." . *Chambers v. Satterlee,* 40 Cal., 497; *Wright v. Chicago,* 46 Ill., 44.

"Const, Art. 8, § 4, requiring the Legislature to provide for the incorporation of cities and to restrict their power of taxation, assessment, borrowing money, etc., does not apply to special assessments for local improvements." *Raleigh v. Peace,* 110 N. C., 32; 14 S. E., 521; 17 L. R. A., 330.

"It is within the power of the Legislature to create special taxing districts, and to charge the cost of a local improvement, in whole or in part, upon the property in said districts, either according to valuation or superficial area or frontage * * * [citing cases]. It has also been ruled that the provision of Article 10 of the Constitution of Missouri in regard to taxation are applicable only to taxation in the ordinary acceptation of the term, and are inapplicable to these special assessments." *Fruin Co. v. St. Louis Co.,* 211 Mo., 524; 111 S. W., 86.

"Const., Art. 9, par. 5, relating to taxes imposed for State, County and municipal purposes, does not apply to special assessments for local improvements." *Drainage Dist. v. Kessler,* 69 Fla., 558; 68 So., 668.

"Drainage assessments are not debts, within the constitutional limitation upon the amount of indebtedness of municipalities for general corporate purposes, since the Constitution does not refer to assessments for local improvements, which represent benefits received" *People v. Honeywell,* 258 Ill., 319; 101 N. E., 571.

"An assessment for the construction of improvements in a drainage district does not create an indebterness * * * within the constitutionl limitation of taxation." *Drain Dist. v. R. Co.,* 266 Mo., 60; 178 S. W., 893.

"A local assessment for the cost of a local improvement held not a tax within Const. §§ 157, 171, limiting tax rate and requiring uniformity of taxes." *Vogt v. Oakdale,* 166 Ky., 810; 179 S. W., 1037.

"The constitutional limit of taxation does not embrace special assessments for municipal improvement." *City of Austin v. Nalle,* 102 Tex., 536; 120 S. W., 996.

"Constitutional provisions which place a limit upon municipal 'taxation' have no application to and do not affect the power of the municipality to make improvements by special assessment."   4 Dillon M. C. (5th Ed.), p. 2505.

By the provisions of the Coastal Highway Act, bonds issued thereunder will be "direct and general obligations" either of the coastal highway district or of the six counties composing the district, and will be "payable primarily" from an annual property tax.   There must be applied, however, to the payment of the principal of the bonds and to the reduction of the annual tax for that purpose the moneys received from the state highway department by way of reimbursement under the reimbursement agreement; and there must be applied to the payment of the interest on the bonds and to the reduction of the annual tax for that purpose so much of the gasoline tax distributed to the six counties under Section 11 of the Pay-As-You-Go Act as may be necessary for the purpose of paying such interest. No property tax can be levied if these other funds prove to be sufficient to pay the principal and interest of the bonds as they respectively fall due.   It is estimated by the state highway department that the funds from which the reimbursements will be made will be far more than will be required for that purpose.

This Court has held a number of times that obligations of the same character as these bonds, secured by the pledge of a fund which might reasonably be expected to be sufficient to meet the obligations without resorting to the levy of a property tax, did not constitute bonded debt within the meaning of the constitutional limitations, notwithstanding that the full faith, credit, and taxing power of a political subdivision were pledged for the payment of the obligation.   *Lillard v. Melton,* 103 S. C., 10; 87 S. E., 421.   *Brownlee v. Brock,* 107 S. C., 230; 92 S. E., 477.   *McIntyre v. Rogers,* 123 S. C., 334; 116 S. E., 277. *Barnwell v. Matthews,* 132 S. C., 314; 128 S. E., 712.

*Sullivan v. City Council of Charleston,* 133 S. C., 189; 133 S. E., 340. In each of these cases the obligations passed upon undoubtedly constituted a debt, in the technical and legal sense of that term, of a political subdivision, a debt payable in future years, evidenced by instruments designated as bonds or having all of the characteristics of bonds. In all but one of the cases the obligations were designated, "certificates of indebtedness," rather than "bonds," but the decisions were not placed upon the ground that a certificate of indebtedness is not a bond. Indeed, in the recent case of *Sullivan v. City Council of Charleston,* 133 S. C., 156; 130 S. E., 873 (decided on the same day as the case with the same title cited above), it was held that notes which were bonds in everything but name should be deemed to be bonds within the meaning of the constitutional limitations. See, also, *Denver v. Home Savings Bank,* 236 U. S., 101; 35 S. Ct., 265; 59 L. Ed., 485.

In one of the case (*Lillard v. Melton*) the obligations were secured by the income of a canal company. In three of the cases (*Lillard v. Melton, Brownlee v. Brock,* and *McIntyre v. Rogers*) the obligations were secured by special assessments levied upon property benefited by street improvements and payable in annual installments. In one case (*Sullivan v. City Council of Charleston*) the obligations were secured by past-due and unpaid taxes. In another case (*Barnwell v. Matthews*) they were secured, as in the present case, by a reimbursement agreement made pursuant to the "Pay-As-You-Go Act." In reliance upon the decisions in these five cases, millions of dollars of county and city obligations have been issued and are now outstanding.

The present case cannot be distinguished upon the ground that these bonds are "direct and general obligations" of a political subdivision, "payable primarily" from a property tax. This will be seen from the following review of the cases:

In *Lillard v. Melton, supra,* it was held that interest coupons of bonds issued by a corporation known as the "Board Trustees of the Columbia Canal" did not constitute bonded debt of the city of Columbia within the meaning of Section 5 of Article 10 of the Constitution, notwithstanding that the city was primarily liable for the payment of the coupons. The statutes under which the bonds were issued (19 Stat. 1090, 1097, approved December 24, 1887), provided that payment of the coupons should be "guaranteed" by the city; that "said board of trustees shall, after the year 1893, pay the interest on said bonds each and every year, if practicable for them to do so"; that the city "shall be authorized and required to levy such a tax on the real and personal property assessed for taxation in the City of Columbia as may be necessary to pay the coupons * * * for the year A. D. 1888, and shall annually thereafter levy a tax sufficient to pay the coupons as they mature on said bonds, and shall pay the same: *Provided,* that after the year 1893 the board of trustees of the Columbia Canal shall pay over semiannually to the City of Columbia" all of the net income of the corporation, "not exceeding in any one year the amount of the coupons maturing"; that the city's "guaranty" should be written on the bonds as follows: "The City of Columbia, S. C., guarantees the prompt payment of each and every coupon attached to this bond"; and that the coupons should be payable at the city treasurer's office. It is clear from these provisions that the city's liability was primary and direct. The city was required to pay the coupons, and to levy a sufficient annual tax for that purpose, which tax was doubtless to be reduced, however, by the amount of moneys received from the canal corporation. The primary fund for the payment of the coupons was the city tax.

In the same case "certificates of indebtedness" issued by and guaranteed by the city of Columbia pursuant to 28 Stat. 585, were held to be not a part of the city's bonded

debt within the meaning of the constitutional limitations. The Statute authorizing the issuance of the certificates contained the following recitals: That the city had assessed a part of the cost of certain street improvements upon abutting property owners, that the city desired "to issue certificates of indebtedness showing amounts due to said city by said property owners as deferred payments upon such assessments for the purpose of realizing money upon such certificates by either selling the same or borrowing money thereon"; that "the property so assessed is bound to said city for the payment of the deferred portions of such assessments, and such certificates of indebtedness do not constitute in reality debts against the city, but merely evidence debts due to the city, and the existence of said lien on said property will fully protect said city against loss upon guaranty of such certificates of indebtedness entered into by said city." These recitals were followed by a grant of authority to the city "to sell any such certificates of indebtedness which may hereafter be issued by said city, * * * or to borrow money upon such certificates of indebtedness, and to pledge such certificates as collateral security for the payment of such debts, and, in either event, to guarantee the payment of such certificates according to the terms thereof, and to pledge the faith and credit of the city for the payment thereof." The record in the case shows that the certificates of indebtedness had fixed dates of maturity extending over a period of several years. Apparently, the certificates were intended to be assignments of the assessments. However that may be, it is clear that the city at least made an absolute guaranty of payment, under which it would become primarily liable at the maturity of the certificates for the payment of the amount thereof, and that the city's faith and credit were pledged for such payment.

The Court did not, in *Lillard v. Melton,* discuss at length the grounds for its decision that the obligation of the City

of Columbia on the interest coupons and paving certificates
above described should not be included as a part of the
bonded debt of the City of Columbia within the meaning of
the constitutional limitations. The Court merely said (103
S. C., 10, 19; 87 S. E., 421, at page 425) :

"Likewise, the liability of the city on the guarantee of the
paving assessments and the interest on the canal bonds con-
stitute but a contingent obligation and must be excluded."

In *Brownlee v. Brock, supra,* and in *McIntyre v. Rogers,
supra,* paving certificates similar to those we have described
were held, without a discussion, to be exempt from the con-
stitutional limitations upon bonded debt, upon the authority
of *Lillard v. Melton.* In *Barnwell v. Matthews, supra,* the
facts were as follows: Act No. 348 of 1925 (34 Stat. at
Large, 723, approved April 1, 1925), authorized Florence
County to issue its "notes" in the amount of $225,000, ma-
turing in three annual installments of $75,000 each, begin-
ning four years after the date of the notes. Of the pro-
ceeds of the notes $205,000 were to be used for the con-
struction of two roads embraced in the State Highway
System and designated in Section 1 of the Pay-As-You-Go
Act; and $20,000 of the proceeds were to be used for the
construction of a road which had not yet become a part of
the State Highway System. The Act directed the county to
pledge as security for the payment of the notes "all surplus
tolls arising from the operation of the Mars Bluff Bridge
and all tolls that may be derived from Godfrey's Ferry
Bridge, which shall accrue to Florence County," and also
"all reimbursements due from the State Highway Commis-
sion," except reimbursements to be paid during the years
1925, 1926, and 1927. The Act further provided as follows
(Section 3) :

"The full faith and credit and taxing powers of Florence
County are hereby irrevocably pledged for the payment of
said notes, and the Auditor of Florence County is hereby
authorized and directed to make a sufficient levy to pay

the interest and installments on said notes, but said levy shall be suspended in case the tolls and reimbursements above mentioned are sufficient to pay said interest and installments of said notes as they become due."

The Circuit Court held that the notes were not subject to the constitutional limitations on bonded debt. The judgment of the Circuit Court was affirmed, without opinion. The grounds for the decision are stated in the judgment of the Circuit Court as follows:

"In the instant case the Legislature has authorized the issuance of obligations to be secured primarily by bridge tolls and highway reimbursements, the work performed with the funds derived from the notes being work specifically designated by statute as that of the State Highway Department, and for which the taxpayer is never to be liable unless the resources pledged fail, and has declared in express language that such obligations are notes. * * * It is perhaps unfortunatae that the Constitution is not more explicit in defining the term 'bonded debt,' but be that as it may, I feel satisfied that whatever other elements may be necessary to make up a bonded debt, certainly one of the most essential is that it must be a primary obligation of the political subdivision involved, and secured primarily by a tax levied on the property holders therein. From the facts pleaded in the affirmative defense and admitted by the demurrer, this essential element is wanting in these obligations. They * * * secure funds borrowed for the building of roads of the State-wide system of public roads. The Act providing for the building of such roads expressly declares, in Section 1 thereof, that they 'shall be constructed by the State of South Carolina and ever maintained as State highways.' It is true Section 6 of the same Acts permits a county to build any roads of such system and to be reimbursed therefor by the State, but this in no way changes the fundamental purpose of the Act, which was to charge the State with the duty of constructing such roads and to

impose upon it the corresponding obligation of paying for them. The Act of April 1, 1925, makes explicit provision for two of the designated highways of the 'Pay-As-You-Go Act,' and authorizes the expenditure of $205,000 thereon. As to these it is too clear for argument that the county is only contingently liable, and in fact I am constrained to hold a taxpayer to the county can never be required to pay any part of such amount as the State would be legally bound to discharge such obligations without permitting such action against taxpayers to the county.

"Under the facts and the law, therefore, the proposed notes to the extent of $205,000 are nothing more than guaranties or other contingent obligations of the county; and in no sense do they constitute a bonded debt thereof. The case, therefore, falls squarely within the decision of *Lillard v. Melton,* 103 S. C., 10; 87 S. E., 421, and must be controlled by it. While the additional $20,000 authorized to be issued is not to be used in the construction of a road already designated as a part of the State system, yet the demurrer admits that it is to become a part of such system. This being true, the notes representing it are governed by the same principle as apply to those to be issued for the other two roads."

In *Sullivan v. City Council of Charleston,* 133 S. C., 189; 133 S. E., 340, the last of the five cases above referred to, the facts were as follows: The city had on its books over $300,000 of uncollected taxes, levied in the years 1921, 1922, 1923, and 1924. On March 14, 1925, there was enacted a statute, Act No. 298 of 1925 (34 Stat. at Large, 661), which provided as follows:

"The City Council of Charleston [the corporate name of the city], Charleston County, is hereby authorized and empowered from time to time to issue its certificates evidencing the amount of taxes or portions thereof which may have been levied against property in the City of Charleston, Charleston County, S. C., and which are past due and unpaid, and to sell, hypothecate or pledge said certificates, and

upon such sale, hypothecation or pledge to assign the same and to guarantee in the name of the City Council of Charleston to the holder thereof the payment of the indebtedness evidenced thereby, at a place and time designated in such guaranty: *Provided, however,* That when the taxes evidenced by said certificates are collected, they shall be applied solely to the retirement of the same until all of said certificates are retired in full; and, *provided, further,* that in the event, at any time, sufficient of the said due and unpaid taxes have not been collected to meet the payment, to the holder of such certificates of the amount which is to be paid under the guaranty indorsed on said certificates at the time such guaranty provides for payment, the City Council of Charleston shall forthwith levy and collect a tax upon all taxable property in the City of Charleston, which, added to the collections made on such due and unpaid taxes, will make a sum sufficient to meet the payment of the amount due on the certificates then maturing; such certificates shall have attached to them interest coupons certifying that the City Council of Charleston will pay to the holder thereof the amount of interest therein stated, which interest shall be fixed by City Council in the ordinance authorizing the issuance of said certificates, and to meet the payment of said interest there shall be included in the general tax levy of each year in which such interest is due, as a part of the ordinary expenses of City Council, a sufficient tax to meet the payment thereof. The guaranty of City Council indorsed on said certificates shall provide the date on which the holder of said certificates may require payment thereof, and such time shall be fixed as in the opinion of City Council it is probable that the collection of said due and unpaid taxes will enable the same to be paid."

In a suit instituted by petition of a taxpayer, it was contended that the issuance of these certificates created a bonded debt with the meaning of the 8 per cent. constitutional limitation and would be in violation of the Constitution,

the existing bonded debt of the city being then up to 8 per cent. limit. In disposing of this contention, the Court merely said:

"The contention of the petitioner is untenable under * * * *Barnwell v. Matthews et al.* [132 S. C., 314], 128 S. E., 712."

The guaranty of the City of Charleston of the certificates of indebtedness was an absolute guaranty of payment upon which the city would become primarily liable at the time of the maturity of the certificates. The holder of a certificate would not, in the event of nonpayment of the certificates at maturity, have to look to the past-due and unpaid taxes upon which the certificates were predicated. Moreover, it appears from the Act that the city could, "in the event, at any time, sufficient of the said due and unpaid taxes have not been collected to meet the payment * * * at the time such guaranty provides for payment, * * * forthwith levy and collect a tax" to pay the certificates; *i. e.,* the city could, if it foresaw an insufficiency in the collections of back taxes, levy the new tax prior to the time of maturity of the certificates. It is noteworthy also that the interest on the certificates was to be paid out of a new tax. Furthermore, we wish to call attention to the provision in the Act directing the city to make the certificates payable at such time as in the opinion of the city it was probable that the collection of the back taxes would enable the city to pay the certificates. Similar provisions are to be found in the Coastal Highway Act. This case was decided by the Court *en banc,* and under the provisions of the Constitution its decision is "final and conclusive."

From the foregoing review of the decisions, it is obvious that the present case cannot be distinguished from the previous cases upon the ground that the obligations here in question are payable primarily out of an *ad valorem* tax, if the Coastal Highway Act had not made such a provision for payment, but had required the holders of the proposed

bonds to look first to the reimbursement moneys and gasoline tax, and required the district or counties to exhaust their remedies against the State Highway Commission or the State Treasurer before resort could be had to the levy of a property tax in order to meet the bonds, the bonds would be unsaleable, or they would have to be sold on such a high interest basis as to make the cost of the financing excessive.

If the proposed bonds would constitute a bonded debt within the meaning of Section 5 of Article 10 of the State Constitution, the amount of the reimbursements to be made by the State Highway Commission should be offset against or deducted from the amount of the bonds in computing the net bonded debt subject to the constitutional limitations; and since the amount of the bonds is not to exceed the amount of reimbursements to be agreed upon, the result will be that the net bonded debt of the road district or counties will not be increased by the issuance of these bonds.

It is well settled that in computing the bonded debt of a municipality for the purposes of a constitutional or statutory limitation upon bonded debt, there should be deducted from the gross bonded debt the sinking funds or other funds pledged for the payment of the debt, and only the difference between the two amounts should be considered as the bonded debt of the municipality. See *Reynolds v. Stark,* 90 Okl., 261; 217 P., 166, and *Town of Camden v. Fairbanks, Morse & Co.,* 204 Ala., 112; 86 So., 8, where most of the cases to this effect are cited. See, also, *Kirk v. School District,* 108 Okl., 81; 234 P., 596.

In a majority of the cases the question was whether cash held in the sinking fund of a city, or some of the city's own bonds held in its sinking fund, should be offset against the gross bonded debt in computing the net debt subject to the debt limit, and it was held that these assets should be deducted. In some of the cases it was held that securities

in a sinking fund, the nature of which securities does not appear in the reports, should be so deducted. No reason can be perceived why the doctrine of these decisions should not be applied in the case of municipal sinking funds invested in bonds other than the bonds of the municipality, as, for illustration, in Liberty bonds. The special funds pledged for the payment of the proposed bonds involved in this case are really sinking funds. They should be deducted from the gross amount of the bonded debt of the road district or counties in computing the net debt subject to the constitutional limitations. If an obligation of the United States, evidenced by a Liberty bond, held in the sinking fund of a municipality, should be deducted from the gross debt of the municipality in computing its net bonded debt, why should not the obligation of the State of South Carolina, evidenced by the reimbursement agreements in question, pledged for the payment of the bonds in question, be deducted from the gross bonded debt of the road district or counties in computing the net bonded debt subject to the constitutional limitations?

It cannot be argued that a highway district or county does not differ from an individual, and that the fact that an individual has assets to pay his debts does not reduce his debts. Such an argument loses sight of the fact that in the case of sinking funds, the cash or securities in the fund are pledged to the redemption of bonded debt and cannot legally be diverted from that purpose.

> *That the Act is in violation of the State Constitution in not specifying the terms of office of the district commissioners.*

Section 11 of Article 1 of the Constitution provides:

"No person shall be elected or appointed to office in this State for life or during good behavior, but the terms of all officers shall be for some specified period, except Notaries Public and officers in the militia. * * * "

Section 2 of the Coastal Highway Act provides that:

"The terms of office of the members of said board shall end when their duties under this Act shall have been fully performed."

16    The term "office" as used in this constitutional provision means a public station permanent in character, and the term "officer" means a person holding such a station. The appointment of certain individuals to perform duties in connection with the construction of a single specified public improvement is not within the constitutional provision. *Metcalf v. Mitchell*, 269 U. S., 514; 46 S Ct., 172; 70 L. Ed., 384. *Sheboygan County v. Parker*, 3 Wall., 93; 18 L. Ed., 33. *Sanders v. Belue*, 78 S. C., 171; 58 S. E., 762.

In *Metcalf v. Mitchell, supra,* it was said: .

"An office is a public station conferred by the appointment of government. The term embraces the idea of tenure, duration. * * * The term 'officer' is one inseparably connected with an office. * * * There were lacking in each instance the essential elements of a public station, permanent in character, created by law, whose incidents and duties were prescribed by law. * * * "

In *Sheboygan County v. Parker, supra,* certain persons were named by an Act of the Legislature to subscribe on behalf of a county to stock in a railroad and issue bonds of the county in payment therefor provided the issue of the bonds was authorized in an election held for the purpose. The election was held, and the majority of votes were cast in favor of issuing the bonds. They were issued, and later suit was commenced to recover the amount of certain interest coupons. The county set up the defense that the Act authorizing the bonds was unconstitutional because it appointed officers to act for the county, while the Constitution required all county officers to be elected by the people or appointed by the board of supervisors. In disposing of the contention

raised by the county, the Supreme Court uses the following language:

"The commissioners or board of supervisors of a county, in the exercise of their general powers as such, have no authority to subscribe stock to railroads, and bind the people of the county to pay bonds issued for that purpose without special authority conferred upon them by the Legislature. But when special authority is given to the people of a county to do these acts, and bind themselves by the issue of such bonds, the Legislature may properly direct the mode in which it shall be effected. The persons specially appointed to act as agents for the people have a ministerial duty to perform in issuing the bonds, after the people, at an election, held for that purpose, have assented that they shall be bound. Such persons in performance of their special duty, are in no proper sense 'county officers.' They do not exercise any of the political functions of county officers, such as levying taxes, etc. They do not exercise 'continuously, and as a part of the regular and permanent administration of the government, any important public powers, trusts, or duties.' *State v. Kennon,* 7 Ohio St., 562."

Another definition is as follows:

"The term 'officer' as used in Constitution, Article 18, § 1, applies to and refers to such officers as have some degree of permanency, and are not created by a terporary nomination for a single and transient purpose. *Shurban v. Hooper,* 40 Mich., 503, 505 (citing *Underwood v. McDuffee,* 15 Mich., 361, 366; 93 Am. Dec., 194)." Words and Phrases, Volume 6, page 4934.

In *Sanders v. Belue,* 78 S. C., 171; 58 S. E., 762, the term "officer" was defined as follows:

"One who is charged by law with duties involving an exercise of some part of the sovereign power, either small or great, in the performance of which the public is concerned, and which are continuing and not occasional or intermittent, is a public officer."

But if the members of the board of Coastal Highway Commissioners are officers within the meaning of the Constitution, it seems to us that there is a sufficient limitation of the tenure of their office in the provision that they shall serve until their duties under the Act are completed. They have no duties under the Act beyond the financing of the construction of the highways, and that is the period specified during which they hold their office.

A similar objection was raised in regard to the Richland County Bond Act involved in *Lillard v. Melton, supra.* In disposing of the objection, the Supreme Court used the following language (103 S. C., pages 14, 15; 87 S. E., 423) :

"The Act provides that 'the commission shall serve for a term of three years, or until the provisions of this Act are completely carried out.' It is contended that this violates the provision of the Constitution (Article 1, § 11), which declares that 'the terms of all officers shall be for some specified period,' etc. The term is for a specified period of three years. The words 'or until,' etc., are not to be construed as extending the term beyond that period without reappointment, but merely as restricting it to the completion of the work, if completed within that time. If an extension of the term beyond three years had been intended, the word 'and' would have been used instead of 'or.' But, we must not be understood as holding that, even if an extension of the term beyond three years had been intended, it would violate the Constitution in this particular. In *State v. Bowden,* 92 S. C., 400; 75 S. E., 866, the Court *en banc* said: 'It would be most unreasonable to impute to the constitutional convention a purpose to give to the expression 'some specified period' a meaning so narrow as to prohibit any legislative provision against the inconvenience arising from vacancies in public office, which would occur if the encumbent could not be allowed to hold until the appointment or election and qualification of his successor.' Besides, in the event suggested, the question would arise, whether appointment for a period of

time necessary to complete a specified work is not for a 'specified period,' within the meaning of the Constitution; and, also, if it were not, whether the extension would nullify the whole Act, or only the appointment for the illegal excess. 20 Cyc., 1396. But the construction given renders the consideration of these questions unnecessary."

This seems to us a clear indication by the Court that it would not hold an Act unconstitutional which limits the term of office by the completion of "specified work."

> *That the Act is in violation of the State Constitution in not requiring the levy of the taxes by the fiscal authorities of the district.*

In the cases of *Dickson v. Burckmyer,* 67 S. C., 526; 46 S. E., 343. *Railway v. Kay,* 62 S. C., 28; 39 S. E., 785, and *Rice v. Shealey,* 71 S. C., 161; 50 S. E., 868, it is held that the word "levy" in this section of the Constitution does not refer to the creation of the tax, but merely to its collection.

> *That the Act is in violation of the State Constitution in not following the constitutional plan of assessment for Florence and Beaufort Counties.*

By a constitutional amendment approved February 24, 1921 (32 Stats., 91), the General Assembly was empowered to authorize the corporate authorities of the County of Florence to levy special assessments upon abutting property for road improvements. A similar constitutional amendment (33 Stats., 69), applicable only to Beaufort County, was approved March 1, 1923. These amendments were manifestly adopted with a view to enlarging the powers of the General Assembly so as to permit it to do something that under the Constitution as it then existed it could not have done. It is equally clear that the amendments were framed with no intention to restrict the powers of the General Assembly as they existed at that time. Before the adoption of these amendments the General Assembly had the right to levy *ad valorem* taxes or assessments, whatever they might

be called, upon all taxable property in Florence and Beaufort Counties, for the purpose of paying for road improvements. The petitioners apparently take the position that this right was taken away by the amendments in question. This position is untenable.

> *That the Act is in violation of the State Constitution in amending the Act of 1924 without reference in the title thereto.*

The petitioners maintain that the Coastal Highway Act makes radical changes in the Act of 1924, and that its title failed to advise the members of the Legislature of these changes. The title of the Coastal Highway Act states, among other things, that the Act is an 'act "to provide for the construction of certain highways" and to "confer certain powers and duties upon the State Highway Commission and other State officers." This language showed that the Act changed the powers and duties of the state highway commission. Inasmuch as the State Highway Commission's principal duty is to carry out the provisions of the Act of 1924, it could reasonably have been inferred from the title of the Coastal Highway Act that that Act modified the Act of 1924.

Nearly every Statute amends, by implication, some prior Statute. The constitutional requirement that the subject of a statute shall be expressed in its title does not require the title to refer specifically to previous statutes which are to be amended. Only a statement of the subject of the new statute is required. It seems to us that the petitioners do not seriously maintain that the title of the Coastal Highway Act is insufficient. In pointing out the changes made by the Coastal Highway Act in the Act of 1924, their chief purpose seems to be to show that the enactment of the Coastal Highway Act was unwise and unfair to the counties of the State not included in the coastal highway district, which was a legislature question.

*That the Act is in violation of the State Constitution in permitting and requiring joint county obligations.*

Section 12a of the Coastal Highway Act provides as follows:

"At the option of the board of Coastal Highway Commissioners created by this Act, the agreement authorized and required by Section 4 to be made by and between the Coastal Highway District and the State Highway Commission may be made by the six counties enumerated in section 1, on the one hand, and the State Highway Commission, on the other hand, so that said counties acting by said board of Commissioners, shall jointly agree to advance the moneys necessary to construct the highway herein provided for, and the State Highway Commission shall agree to reimburse and repay said counties for the moneys so advanced. If said agreement shall be made as provided in this section all of the provisions of Section 4 and subsequent sections referring to said district shall be construed as referring to said counties, collectively, and all powers and duties given or attempted to be given by this Act to said district shall be deemed to have been given to said counties, collectively, to be exercised and performed by said board of commissioners and all things authorized or required by this Act to be done on behalf of said district shall be done on behalf of said counties, collectively, and all bonds and notes issued under this Act shall be issued in the names of said six counties, as joint obligations of said counties, and shall be payable in the manner and from the funds provided by this Act for the payment of district obligations and the property tax levied pursuant to Section 11 shall be levied at an equal and uniform rate on all taxable property in said counties, collectively."

If these provisions are valid, the bonds may be issued even if it should be held that the creation of a road district or the delegation of taxing power to a road district are impliedly forbidden by the Constitution.

In the brief submitted on behalf of the petitioners it is said (page 10):

"If the Legislature can throw six counties together and require them to make a joint contract through new agents arbitrarily selected by the Legislature, the latter body by the same token can merge the counties into the form of a district for the special purpose in view. The district is nothing more than a union of the counties. If the Legislature has no power to create the district, by a party of reasoning, it could have no power to make them joint contractors."

But it is well settled that the Legislature can authorize two or more political subdivisions to make a joint contract.

In *Fripp v. Coburn,* 101 S. C., 312; 85 S. E., 774, there was before this Court a special Act which authorized a joint bond issue by two townships for the purpose of building a bridge, and which provided for the levying of a uniform *ad valorem* tax on all taxable property in the two townships, considered as a unit, the tax to be levied by the County Auditor and collected by the County Treasurer. The Act was attacked upon the ground that it violated Sections 5, 6, and 13 of Article 10, and Sections 5 and 7 of Article 1 of the State Constitution and the Fourteenth Amendment to the Federal Constitution. It was upheld as against these objections. After quoting these constitutional provisions, the Court said:

"The Constitution of the State is a restraint of power and the Legislature may enact any law not prohibited by the Constitution.

"(1) This Act is not prohibited by Article 1, § 5. The power vested in the townships to issue bonds does not prohibit the Legislature from exercising a similar power. * * *

"(3) The Legislature is not prohibited from directing the issuance of these bonds by Article 10, § 13, because the regular assessment is not interfered with.

"(4) Article 1, § 5, is not violated because the bonds were

issued by due process of law. The Legislature * * * had the right to create new townships or consolidate old townships, either permanently or for a special purpose. It did consolidate these two townships for the purpose of this election and the issuance of these bonds."

In recent years the General Assembly has passed dozens of statutes authorizing counties to co-operate in the building of bridges. In some cases the bridges were entirely outside of the limits of one or more of the co-operating counties. The validity of this legislation has not been questioned.

*That the Act is in violation of the State Constitution in that it is a special law.*

In contending that the Coastal Highway Act falls within the constitutional inhibition of special legislation, the petitioners overlook the constitutional amendment ratified February 18, 1905 (24 Stats., 830), which provides that: "The General Assembly of this State may enact local or special laws concerning the laying out, opening, altering or working roads or highways. * * * " This constitutional amendment was obviously not intended to apply to legislation concerning the improvement of roads.

Moreover, it is settled that a special Act authorizing a county or other political subdivision to issue bonds is not within the constitutional prohibition of special legislation. *Sullivan v. City Council of Charleston,* 133 S. C., 189; 133 S. E., 340. *City of Columbia v. Smith,* 105 S. C., 348; 89 S. E., 1028.

*That the Act of 1924 is in violation of the State Constitution which prescribes a limitation upon the bonded debt of certain political divisions of the State.*

This objection is disposed of by the case of *Barnwell v. Matthews,* 132 S. C., 314; 128 S. E., 712, and by the cases hereinbefore cited.

*That the Act is in violation of the State Constitution in improperly delegating the power of taxation and setting up a new government unit.*

As has been shown, there is no delegation of the power to tax, but direct action on the part of the General Assembly; and even if the power of tax had been delegated to the authorities of the special tax district we can find no valid objection thereto. That the General Assembly had the power to create the so-called new governmental unit sufficiently appears from what has been said.

*That the Act is in violation of the State Constitution 27 in requiring State officers to perform duties in connection with the district.*

Under Article 4, § 24, the duties of the State officers therein directed to be elected are required to be specified by law; that is, by action of the General Assembly. They, of course, may be added to as the General Assembly may from time to time prescribe.

The judgment of this Court is that the petition be dismissed.

MESSRS. JUSTICES WATTS, BLEASE, and STABLER, and MR. ACTING ASSOCIATE JUSTICE C. J. RAMAGE concur.

MR. CHIEF JUSTICE GARY did not participate.