15982

ASHMORE *ET AL.* v. GREATER GREENVILLE SEWER DIST.
*ET AL.*

(44 S. E. (2d) 88)

*Mr. John Bolt Culbertson,* of Greenville, for Appellants,

*Mr. J. Wilbur Hicks,* of Greenville, for Respondents.

*Messrs. J. Wilbur Hicks,* of Greenville, and *Huger Sink-ler,* of Charleston, for Respondents, on re-hearing,

August 28, 1947.

STUKES, J.: There was approved June 3, 1940, 41 Stat. 2510, an Act of the General Assembly, No. 1210, entitled as follows: "An Act to provide for the Erection, Control and Use of an Auditorium and Community Center for Greater Greenville Sewer District in Greenville County, to Appoint a Board of Trustees Therefor, to Provide for the Issue of Bonds for Greater Greenville Sewer District not to Exceed Three (Hundred) Thousand ($300,000.00) Dollars, to Submit this Question to the Qualified Electors of said Greater Greenville Sewer District and to Levy a Tax to Retire the Bonds Hereby Issued".

History of the creation of Greater Greenville Sewer District is conveniently found in the opinion in the case in this Court of *Rutledge v. Greater Greenville Sewer Dist. et al.*, 139 S. C. 188, 137 S. E. 597.

It will be seen by reference to the published Act of 1940 that it undertook to establish a Board of Trustees for the erection, maintenance and management of an auditorium for the use of the people of the District, which Board should be composed as follows:

"The Board of Trustees shall consist of ten members and be composed as follows: (a) L. E. Brookshire, a representative of labor, whose successor shall be elected by the Greenville County Legislative Delegation, Senator from Greenville County in the State Senate, the Mayor of the City of Greenville, the Chairman of the County Board of Commissioners for Greenville County, the President of the Kiwanis Club, the President of the Rotary Club, the President of the Lions Club, the President of the Exchange Club and the President of the Chamber of Commerce for the City of Greenville, all of whom except the first named shall become members of this Board of Trustees by reason of the office they hold and shall remain on the Board of Trustees so long as they hold their respective offices, and their successors in office shall immediately become members of the Board of Trustees upon qualifying for their respective offices; (b) one member of the Greenville County Delegation who shall be elected by the said Delegation and who shall remain on the said Board of Trustees so long as he is a member of the said Delegation."

It was provided in section 3 that the auditorium should serve for all public meetings and, quoting, "educational rallies, philanthropic, charitable and community betterment assemblies, and it shall serve as the headquarters for all public welfare activities for Greenville County." Other sections authorized the County Board of Commissioners of Greenville County to order an election, upon the request of the Board of Trustees, in the Sewer District on the day of the first Democratic Primary in August, 1940, wherein the qualified electors of the Sewer District should vote upon the question of the issuance of coupon bonds in the amount of $300,000.00 and upon the favorable result of the election

the County Commissioners should advertise and sell bonds upon terms and maturities within their discretion, at interest not exceeding six per cent. per annum, and the proceeds of the sale should be deposited with the County Treasurer and paid out on order of the County Commissioners for the stated purposes. The bonds should be obligations of Greater Greenville Sewer District and, quoting, "the full faith, credit and taxing power" of the District was irrevocably pledged for the payment of the bond principal and interest. Finally, a survey of the District was provided for the determination and marking of its boundaries, the cost thereof to be paid from the proceeds of the sale of the bonds.

. The election was held and resulted in a majority in favor of the issuance of the bonds. There were contests before the County Board of Canvassers and the State Board, but they were dismissed and the declared result of the election was confirmed.

This action for injunction was commenced on October 25, 1941, by J. D. Ashmore, as petitioner or plaintiff, who was later joined by additional plaintiffs who were represented by other counsel. This counsel later became ill and died, which accounts in part for the great delay in the litigation.

Numerous grounds of constitutional and other attack were made by the plaintiffs, all of which were overruled by the Master, to whom the case was referred, and by the trial Judge who heard and dismissed the exceptions to the Master's report, the latter by decree dated August 17, 1946. This appeal followed.

Meanwhile during the progress of the action two pertinent acts were passed by the General Assembly at its 1945 session, the first published being No. 332, approved May 7, 1945, 44 Stat. 956, the intent of which was to validate the creation of the territory of Greater Greenville Sewer District into a body corporate and politic for the purpose of the erection and maintenance of the auditorium and community

center; to validate the bond election and declare the bonds obligations of the Auditorium District; to levy taxes for payment of the principal and interest of the bonds and operate the auditorium; and to validate all appointments to the governing Board of Trustees. The terms of the act are appropriate to accomplish the purposes which we have stated from the title. The election is referred to as having authorized the creation of the District and the issuance of the bonds for the purpose of purchasing a site, erecting and equipping the auditorium for the purposes stated in Section 2 of the Act; and provided that the bonds when issued shall constitute legal obligations of the District, both as to principal and interest, and the prior proceedings looking to the issuance of the bonds were expressly validated, ratified and confirmed.

There follows in Section 3 of this first Act of 1945 the following with reference to the composition of the Board of Trustees of the Auditorium District:

"That any and all appointments to the board of trustees created by the said Act hereinabove referred to, be and the same hereby are validated, ratified, confirmed, approved and declared legal in all respects and Messrs. L. E. Brookshire, a representative of labor, the Senator from Greenville County in the State Senate, Ben T. Leppard, and his successor, Ray R. Williams, the Mayor of the City of Greenville, C. Fred McCullough, the Chairman of the County Board of Commissioners for Greenville County, R. A. Jolley, the president of the Kiwanis Club, George Ross, and his successor, Dupre Rhame, the president of the Rotary Club, Frank G. Hamblen, the president of the Lions Club, Herbert H. Provence, the president of the Exchange Club, Robert R. Scales, Jr., the president of the Chamber of Commerce for the City of Greenville, G. Heyward Mahon, Jr., and the member of the Greenville County Delegation elected by said Delegation, Charles Verner, and the successor of any or all of them, are declared, the former members to have been, and their successors to be the duly qualified

and acting members of the Board of Trustees of the Greenville Auditorium and Community Center, with all the rights, powers, and duties granted unto the Board of Trustees of the Greenville Auditorium and Community Center by Act No. 1210 of the Acts of the Legislature of the State of South Carolina of the year 1940 and Acts supplemental thereto and amendatory thereof."

The subsequently published Act of 1945, also approved May 7, but is No. 333, 44 Stat. 958, was in part for the purpose of amending the original Act of 1940 by substituting in Section 1 the following provision relating to the composition of the Board of Trustees:

"The Board of Trustees shall consist of thirteen (13) members and be composed as follows: (a) The Senator from Greenville County in the State Senate; a member of the House of Representatives from Greenville County Delegation who shall be elected by the Delegation and shall serve for the term specified by the Delegation; (b) L. E. Brookshire, a representative of organized labor who has heretofore acted by virtue of authority of this Act and shall continue to act until his successor has been selected and has qualified, as herein authorized. Immediately after the approval of this Act, the Greenville Trades and Labor Council shall select a representative to succeed L. E. Brookshire, and such representative shall serve for a period of three years, and succeeding representatives shall be so elected for a like period thereafter; (c) The Mayor of the City of Greenville, the Chairman of the County Board of Commissioners for Greenville County; and (d) A representative of each of the following organizations of the City of Greenville, each of which shall elect its own representative and the first representative so elected shall serve for the terms named: The Lions Club whose first representative shall serve for a period of three years; the Kiwanis Club whose first representative shall serve for a period of three years; the Rotary Club whose first representative shall serve for a period of three years; the Exchange Club whose first representative shall

serve for a period of two years; the Optimist Club whose first representative shall serve for a period of two years; The Altrusa Club whose first representative shall serve for a period of two years; The American Legion Post whose first representative shall serve for a period of one year, and the Chamber of Commerce of the City of Greenville whose first representative shall serve for a period of one year. After the expiration of the first term, all such representatives shall be elected for a period of three years, and in all cases each shall serve until his successor has been elected and has qualified. Should either of these organizations cease to function, from that time it shall cease to have a representative on the Board of Trustees. Should any such fail to select a representative, such vacancy shall be filled by the legislative delegation of Greenville County. In case of death or disqualification of any member of the Board, the body or organization selecting him shall select a representative to fill his unexpired term."

The Act of 1940 was further amended by this Act No. 333 of 1945, so as to require before the issuance of the bonds donations, contributions or Federal grant to the cost of the Auditorium in at least an amount equal to the bonds, to wit, $300,000.00, whereby the total is determined by the Board to be adequate to purchase a site and construct and equip an Auditorium of a seating capacity of five thousand. Another important amendment included in Act No. 333 of 1945 was the insertion of a new section, 9(a) in the Act of 1940, as follows:

"Until the principal and interest of all bonds issued under this Act shall be fully paid, there shall be levied annually on all taxable property in Greater Greenville Sewer District a tax sufficient to pay such principal and interest as they become due, and should a sinking fund be necessary, to provide a sinking fund sufficient to pay such principal at the maturity thereof; and in addition thereto, a tax shall be levied annually sufficient to pay the cost of maintaining and operating said Auditorium. The sums necessary to be raised

by taxation annually as provided in the above paragraph shall be determined by the Board of Trustees who shall certify such amounts to the officers having the duty of the levy and collection of taxes for county purposes in Greenville County. The said annual tax shall be levied and collected by the same officers and in the same manner as is provided for the levy and collection of taxes for county purposes in Greenville County. The money so collected shall be applied by or under the direction of the Board of Trustees, first, to the payment of principal and interest as they respectively become due; second, to the cost of operating and maintaining the Auditorium, and, pending such application, shall be deposited or invested under the direction of the Board of Trustees by the County Treasurer."

Other provisions of this Act No. 333 of 1945 amend the Act of 1940 in particulars which are unimportant in the present controversy. Convenient reference may be had to them in the volume of the published Acts of the General Assembly which has been cited.

There will be first considered the exception which challenges the constitutionality of the provisions of the act as last amended relating to the composition of the governing Board of the projected auditorium. It is an executive body, charged with executive duties and functions (so found by the trial court, to which there is no exception) and yet it is proposed to be composed in part of members of the legislature by inclusion upon the Board of the Senator and a Representative of the county, who are legislative officers. Section 14 of Art. I of the Constitution of 1895 is as follows:

"In the government of this State the legislative, executive and judicial powers of the Government shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other."

An enlightening discussion of the quoted provision is found is *Spartanburg County v. Miller,* 135 S. C. 348, 132 S. E. 673, 677, where it was said: "As a

general rule the Legislature of the state may not, consistently with the constitutional requirement here involved, undertake both to pass laws and to execute them by setting its own members to the task of discharging such functions. by virtue of their offices as legislators, would seem to be self-evident. The principle, as we apprehend, upon the correct application of which depends the solution of any such problem as to the exercise by the Legislature of nonlegislative functions, is that the Legislature may properly engage in the discharge of such functions to the extent, and to the extent only, that their performance is reasonably incidental to the full and effective exercise of its legislative powers." Paraphrasing the sentence which precedes this quotation from the opinion, it may be said that the members of the Legislature from Greenville County were elected for the purpose of making laws, not administering them.

The principle stated in *Spartanburg County v. Miller, supra,* was applied in *Bramlette v. Stringer,* 186 S. C. 134, 195 S. E. 257, and a county bond issue act was held invalid for attempting to leave the execution of the law to the members of the legislature from the county. The authority of that decision cannot be consistently avoided in this. It requires similar holding of invalidity of the challenged provisions.

The qualifications of members of the General Assembly are carefully set out in Article III of the constitution. Section 24 thereof forbids the holding of other public office or position, and provides that upon the acceptance of any such by a member he shall vacate his seat. The proposition seems to us to prove itself, that a member cannot sit upon the board of auditorium trustees established in the act under review and at the same time retain his membership in the General Assembly. The language of the fundamental law is plain and unambiguous. It admits of no doubt of its meaning.

It is no answer in this case to say (which seems to have satisfied the lower court) that, granting that the office or

position of trustee conflicts with legislative membership, the latter would only be vacated by a member accepting appointment to the Board, and would not affect the validity of his board membership. *State v. Buttz*, 9 S. C. 156; *Darling v. Brunson*, 94 S. C. 207, 77 S. E. 860; *Mitchell v. Jones*, 94 S. C. 487, 78 S. E. 528; *Clarke v. South Carolina Public Service Authority*, 177 S. C. 427, 181 S. E. 481; *McLure v. McElroy*, S. C. 44 S. E. 101; 46 C. J. 947; 42 Am. Jur. 940 *et seq.;* Throop on Public Officers, Sec. 31, p. 34; Mechem, idem., Sec. 420, p. 267. Annotations: 13 L. R. A. 670; L. R. A. 1917-A, 231; 100 A. L. R. 1162. But being no longer a member of the legislature, the supposed vacater would then be ineligible for membership on the Board under the terms of the act. The cycle could go on forever without improvement of the illegal status of the Board, in so far as these members are concerned.

The constitution contains another prohibition which ■ (in addition to its applicability to the members of the legislature) prevents legal membership upon the Board of the Mayor of the City of Greenville who is designated in the Act as a member. It is included in section 2 of Art. II: "But no person shall hold two offices of honor or profit at the same time." Again applicable is the observation that should the mayor vacate that office by becoming a member of the Board he would thereby become ineligible for Board membership under the terms of the act. It is a trap-like process from which no legal avenue of escape appears. The Chairman of the Board of County Commissioners of Greenville County is in similar plight and he cannot constitutionally take or hold his Auditorium Board memmembership along with his present office.

This is a taxpayers' action, instituted to prevent the ■ issuance of bonds which, if issued, would increase appellants' respective property tax liabilities, so there is no question of appellants' capacity to raise this point of unconstitutionality of the provisions of the act whereby the

board was attempted to be created for the purpose of issuing the bonds, etc. There is this important and distinguishing difference between the case in hand and that of *Culbertson v. Blatt et al.,* 194 S. C. 105, 9 S. E. (2d) 218.

> The rule here enforced with respect to double or dual office holding in violation of the constitution is not applicable to those officers upon whom other duties relating to their respective offices are placed by law. A common example is *ex officio* membership upon a board or commission of the unit of government which the officer serves in his official capacity, and the functions of the board or commission are related to the duties of the office. *State ex rel. Ray v. Blease,* 95 S. C. 403, 79 S. E. 247, 249, 46 C. J. 934, 42 Am. Jur. 929. *Ex officio* means "by virtue of his office." 1 Bouv., Law Dict. Rawles' Third Revision, page 1103. Similar observation may be made with respect to *ex officio* membership upon a governing board, commission or the like of an agency or institution in which the unit of government of the officer has only a part or joint ownership or management. In mind as an example is an airport operated by two or more units of government. A governing board of it might be properly created by appointment *ex officio* of officers of the separate governmental units whose duties of their respective officers have reasonable relation to their functions *ex officio*. These observations are made to make clear that the present adjudication will not affect the state of the law with respect to *ex officio* officeholding as it is recognized in the law of this and other jurisdictions. An enlightening decision upon the subject is *McCullers v. Board of Wake County,* 158 N. C. 75, 73 S. E. 816.

A further problem is presented in connection with the appointment or election of the other members of the Auditorium Board. The pertinent provisions of the last legislative enactment, which was the second of the session of 1945, are quoted *supra.* It is seen that they shall be "representatives of" and "elected by" sundry organizations which are

otherwise entirely unconnected with government in any form.

Such delegation by the lawmaking body to persons, groups or organizations unrelated to government of power to appoint or elect public officers constitutes a difficult and important problem of constitutional law which has vexed the courts and textwriters. It was encountered by this Court in *Gibbes v. Richardson*, 107 S. C. 191, 92 S. E. 333, but the point was not discussed and the questioned statute required only the recommendation to the governor by an unofficial body of aim kindred to that of the office (the Audubon Society of South Carolina) of a person for appointment as State Game Warden, subject to confirmation by the Senate; and *State ex rel. Coleman v. Lewis*, 181 S. C. 10, 186 S. E. 625, in which the delegation of the appointive power was to groups of legislators, who are, of course, officials. Thus the proposition appears not to have heretofore come to this court as baldly as it is presented in the present case.

The authorities elsewhere are not uniform and no fixed rule is deducible from them. Conflicting text comment is found in 22 R. C. L. 428, 42 Am. Jur. 953 and 46 C. J. 950, each with cited supporting decisions of courts of last resort. Beginning at page 474 of 79 L. Ed. is an elaborate article upon the subject of the limits of the delegation of legislative power, in which the vesting of elective or appointive authority in unofficial persons or bodies receives brief attention at page 501.

In *Overshiner v. State*, 156 Ind. 187, 59 N. E. 468, 51 L. R. A. 748, 83 Am. St. Rep. 187, an act was upheld whereby a corporation of dentists was given power to appoint some of the members of a state board of dental examiners. A similar case is *Scholle v. State*, 90 Md. 729, 46 A. 326, 50 L. R. A. 411, where under Maryland law medical examiners were appointed by incorporated medical societies. Like approval was given a law under which police commissioners appointed by the General Assembly were empowered

to choose their own successors in *Mayor, etc., of City of Americus v. Perry,* 114 Ga. 871, 40 S. E. 1004, 57 L. R. A. 230. An early and leading case on the subject is *In re Bulger,* 45 Cal. 553, in which it was held that the legislature might confer the power of appointing a city fire commissioner upon a board of fire underwriters which was a voluntary association of private persons. There was cited in the argument of the instant case the very recent decision of *Kotch et al. v. Board,* 67 S. Ct. 910, in which a Louisiana statute was upheld as not a denial of the equal protection of the laws under the Federal Constitution despite its requirement that harbor pilots should not be licensed unless they had served a specified apprenticeship under incumbent pilots and were recommended by the Board of River Pilot Commissioners, the members of which were pilots. Besides other distinguishing features of that case, the law provided that the licensed pilots are state officers. The Board was, therefore, not composed of unofficial persons as here the electing clubs are.

None of the cases cited can be said to apply to the situation before us. None of them goes so far afield of officialdom as does this. The logical and reasonable solution of our problem appears to be to follow a rule that where there is little or no relation between the unofficial persons, body or organization, to whom the power of nomination, appointment or election is attempted to be delegated, and the law to be administered, the legislative provision so purporting is invalid for such lack of substantial and rational relation between the appointive or elective power and the function of government which the appointees or electees are to perform. The decisions which have been cited comport with this concept. Departure from it, as in the legislation before us, is discriminatory to the degree of violation of the State Constitution, Art. I, Sec. 5, which contains our "equal protection" and "due process" clauses.

In the present case it is difficult to the point of impossibility to discern any substantial or rational relationship between the Rotary, Kiwanis, Lions, Exchange, Optimist and Altrusa Clubs, the American Legion, the City Chamber of Commerce and the Trades and Labor Council, and the construction and operation of a public auditorium for the purposes stated in the act. For that reason we are constrained to declare the plan of appointment of these board members invalid. There is no apparent justification for the attempted delegation of the appointive or elective power to these unofficial persons who are organized into nongovernment-related bodies.

The rule which we approve goes no further than to invalidate attempted delegation by the legislature of the appointive or elective power to unofficial persons or bodies where the latter are without rational and substantial relation to the law to be administered by the appointees or electees, or, we add, to the public institution to be governed. Other instances of the delegation of the appointive or elective power which may be unaffected by this decision, as to which we express no opinion, exist in our statutes. For instance, attention has been called to Act No. 108 of the Acts of 1947, approved April 18, 1947, 45 Stat.—, which relates to the composition of the Board of Visitors of The Citadel, the Military College of South Carolina, and provides that two of the members shall be elected by the Association of Citadel Men or any succeeding organization of Citadel men (alumni). This is certainly a delegation by the legislature of the power of appointment or election to public office. Its validity is not before us and we carefully refrain from any expression concerning its constitutionality except to say that it does not necessarily come within the rule here set forth and applied, because it may be reasonably said that former students of an educational institution are more familiar with its operation than the average of other citizens and, therefore, are presumably better judges of the suitability of its administrators and of the wisdom of their official actions. Like comment

can be made with respect to the appointment of the judges of the Juvenile-Domestic Relations Courts of counties which have them pursuant to Act No. 509 of 1944, 43 Stat. 1381, who are nominated by the members of the Bar Associations of the respective counties affected. But as to the validity of that feature of the cited act we also express no opinion for it is not, of course, within the scope of the present action.

If this were an ordinary case, our opinion might well stop here. The Board of Trustees of the projected Auditorium District has been held invalid *in toto*. The district is a headless body and cannot function under the present legislation. But the case is not an ordinary one; it is not a private controversy between individuals, as such. On the contrary, it is defended by an intended governmental agency which the legislature undertook to create by their enactments; and raised on the record are earnestly argued public questions of importance. The last stated factor brings into play the principle, now generally established, that questions of public interest originally encompassed in an action should be decided for future guidance, however abstract or moot they may have become in the immediate contest. 3 Am. Jur. 310, Annotation, 132 A. L. R. 1185.

Turning then to the remaining questions which are of public interest, the most important appears to be whether the legislature may constitutionally create by act a special district of designated territory of the State and authorize it to issue bonds and construct and operate a public auditorium for the purposes stated in the legislation before us. We think that it can and we shall state the considerations which induce the conclusion. The first and most persuasive is the fundamental fact that in the General Assembly rests plenary legislative power, limited only by the constitutions, State and Federal. Legislation not expressly or impliedly inhibited by one or the other of these documents may be validly enacted. *Floyd v. Parker Water and Sewer Subdistrict,* 203 S. C. 276, 17 S. E. (2d) 223.

There is a line of recent cases from this court, upon the authority of which we do not impinge, that were decided in conformity with section 6 of Art. X of the Constitution of 1895 which contains a limitation upon the governmental units therein named (counties and townships) of the purposes for which bonds may be issued and taxes levied. *Gentry v. Taylor,* 192 S. C. 145, 5 S. E. (2d) 857; *Benjamin v. Housing Authority of Darlington County,* 198 S. C. 79, 15 S. E. (2d) 737 (dictum); *Doran v. Roberston,* 203 S. C. 434, 27 S. E. (2d) 714; *Parrott v. Gourdin,* 205 S. C. 364, 32 S. E. (2d) 14. These cases were mainly concerned with legislative efforts to authorize counties to use their funds, bonds and taxes, for purposes other than those enumerated in Sec. 6, Art. X of the constitution which is expressly applicable to counties and townships. They did not deal with specially created districts. Of equal importance are other decisions which uphold the legislative creation of districts for designated public purposes to which we not only also adhere but follow for the purpose of this decision. *Evans v. Beattie,* 137 S. C. 496, 135 S. E. 538, which contains a comprehensive review of the earlier authorities; *Briggs v. Greenville County,* 137 S. C. 288, 135 S. E. 153; *Rutledge v. Greater Greenville Sewer District, supra,* 139 S. C. 188, 137 S. E. 597; *State ex rel. Richards v. Moorer,* 152 S. C. 455, 150 S. E. 269; *Floyd v. Parker Water and Sewer Subdistrict, supra,* 203 S. C. 276, 17 S. E. (2d) 223. In these cases the creation and operation of special districts were approved for the purposes of highways and bridges, water supply and sewerage, fire fighting and garbage disposal. By what reasoning can the constitutional door be closed against a public auditorium district? In view of the cited precedents we do not think that it logically can.

The constitution contemplated other subdivisions of the State than those definitely named in it. There are express references to "other subdivisions", or words to that effect, in addition to "county, township, school district, municipal corporation" in Art. X and possibly else-

where in the instrument. And, of course, they have stood against constitutional attacks in the decisions last cited and others. Constitutional limitations upon the legislative power with respect to subdivisions of the State are applicable only to the subdivisions named in the respective inhibitory provisions of the constitution. *Lillard v. Melton,* 103 S. C. 10, 87 S. E. 421.

■ That a publicly owned and operated auditorium serves a useful public purpose will not be gainsaid in this day. It is common knowledge that large assemblages are frequently in the public interest and courthouses and school auditoriums are often no longer able to accommodate them in these times of large centers of population, easy and inexpensive travel and short work hours. This court apparently has not had the direct question before, but others of high standing have held an auditorium to be a proper public purpose and we agree. *Anderson v. Thomas,* 166 La. 512, 117 So. 573; *Adams v. City of Durham,* 189 N. C. 232, 126 S. E. 611. (The North Carolina Court later drew the line against a hotel which was proposed to be constructed by an issue of bonds in *Nash v. Town of Tarboro,* 1947, 227 N. C. 283, 42 S. E. (2d) 209, citing *Haesloop v. City Council of Charleston,* 123 S. C. 272, 115 S. E. 596). *Robbins v. Kadyk,* 312 Ill. 290, 143 N. E. 863; *Halbruegger v. St. Louis,* 302 Mo. 573, 262 S. W. 379. Earlier decisions are reviewed in the annotation in 12 Ann. Cas. 1112 in which our tangent case of *Jones v. City of Camden,* 44 S. C. 319, 23 S. E. 141, 51 Am. St. Rep. 819, is cited.

■ That the General Assembly by passage of the questioned legislation has, in effect, found and declared the proposed auditorium to be a public purpose is important in our conclusion that it is. Indeed, such a finding will not be disturbed by the court unless it is clearly wrong. *McNulty v. Owens, et al.,* 188 S. C. 377, 199 S. E. 425, and prior authorities there cited.

Were this a county or township, undertaking to issue bonds or levy taxes for the erection and maintenance of a public auditorium pursuant to legislative author-. ity, it might be plausibly argued that the expenditure was for "educational purposes" which is an expressly approved purpose in Sec. 6 of Art. X, but here concerned is a specially created district, a subdivision of the State which is neither a county nor a township, and it is, therefore, not affected by the ban of this section. Incidentally, it is common knowledge that many school districts have separately constructed and maintained auditoriums for the advantage and convenience of their pupils, patrons and the public.

The leading case in our reports upon the power of ██ the legislature to carve out a district from the territory of the State for the accomplishment of some public purpose and levy taxes thereupon is *Evans v. Beattie, supra,* 137 S. C. 496, 135 S. E. 538, 542. Upon the question of the taxing of the property in the territory the court said: "The taxation authorized by the act (the Coastal Highway Act) is not referable, as general taxes, to the power of the state by an equal and uniform method, to tax all property for a public purpose. It is, on the contrary, the exercise by the Legislature of the assumed right to carve out of the territory of the state a special district, and to order in the form of a tax upon all property in that district a special assessment for local improvements". The reference to equality and uniformity (Const., Art. X, Sec. 1) appears to have been unnecessary. It is sufficient if these qualities exist with respect to all property in the special district. *Bagnall v. Clarendon ·& Orangeburg Bridge District,* 131 S. C. 109, 126 S. E. 644, which went further on this feature than the proposition for which we cite it. The consequent justification of the property tax levy as a special assessment for local improvements was therefore apparently also unnecessary. Property taxes levied by the legislature for the erection and maintenance of an auditorium will not be said to be special assessments rather than taxes, and they need not be in order

to uphold them. The plenary legislative power of the General Assembly is sufficient authorization for the levy of the taxes in the absence of constitutional inhibition, which latter we do not find.

The following is also taken from the opinion in *Evans v. Beattie, supra*: "We think it is clear therefore that the Coastal Highway Act is the exercise of the power of the General Assembly to impose a special assessment for local improvements and not a general tax for public purposes, and that this power is derived from the general legislative powers of the General Assembly, not restricted by any constitutional provisions or by the absence of special constitutional authority". The quoted conclusion is applicable to this case where general taxes are imposed by the legislature uniformly upon all the property in a specially created district for a specially declared legislative purpose. Both conclusions are sound for the same obvious reason, to wit: there is no constitutional barrier. There is none against an assessment for local benefits in a specially constituted area, for convenience called a district; and just as plainly there is none against a legislative levy of general property taxes for a specified public purpose in a similarly created district. Following the thought and language of the opinion of the court in *Evans v. Beattie, supra*, the levy by the legislature on all the property of the Auditorium District is not a tax for general public purposes, but plainly is a general tax, in the sense that it bears uniformly upon all the property in the district, but it is for a special public purpose. There is in it no violation of any express or necessarily implied provision of the constitution.

The conclusion reached is not novel in American constitutional law. Naturally the constitutions of the several States vary in their contents and the differences are reflected in the decisions. The following is from 49 Am. Jur. 256: "The legislature may, except so far as it is restricted by the constitution, establish such a system for the convenient administration of public affairs throughout its territorial limits as

seems to it best. * * * The creation of municipal corporations is a political function which rests solely in the legislative branch of the government, and in the absence of constitutional restriction the power of the legislature over them is practically unlimited. The legislature may, if it sees fit, abolish all municipalities in the State and revert to direct control of local affairs, *or it may make a new subdivision of the State.* * * *" (Emphasis added.) Similarly, "home-rule" is conspicuous by its near absence in this State under our constitution. *Lillard v. Melton, supra,* 103 S. C. 10, 87 S. E. 421. A leading case on the subject is the Illinois decision of *Kocsis v. Chicago Park District,* 362 Ill. 24, 198 N. E. 847, 851, 103 A. L. R. 141, in which it was concluded as follows: "The Legislature may create any conceivable kind of corporation it deems wise for the more efficient administration of public affairs and endow such corporation and its officers with whatever powers and functions it deems necessary and proper for the administration of the corporate affairs".

The generalizations just quoted are broader than we need adopt and are used to show the length to which some courts have gone in this direction. Other "foreign" decisions are found in 46 A. L. R. 651 *et seq.,* Special Taxing Districts. But there are precedents in this State in addition to the highway and sewer district cases which respondents rely upon and which we have cited. Reference is had to the several decisions upholding the creation of high school districts by special legislative acts (supported by property taxes) despite the constitutional ban (Art. III, Sec. 34) against the creation in that manner of school districts; there is no prohibition of auditorium or similar districts or special legislation thereabout. *Arnette v. Ford,* 129 S. C. 526, 125 S. E. 138; *Powell v. Hargrove,* 136 S. C. 345, 134 S. E. 380; *Walpole v. Wall,* 153 S. C. 106, 149 S. E. 760. These cases proceed mainly upon the reasoning applied here.

It is suggested that there is danger in the possibility that overlapping subdivisions may result in an unbearable burden of taxation, a pyramiding of levies. The answer is the power of the General Assembly to control. The reins of taxation rest in the hands of the members; they are the representatives of the people whom they face in frequent elections. In the latter lies the means of protection of the taxpayers, if needed. If it was an inadvertence of the framers of the constitution that there is not more control in the fundamental law, the omission cannot be supplied by the court. *Lillard v. Melton, supra,* 103 S. C. 10, 87 S. E. 421. The General Assembly is a coordinate branch of the government and is supreme in its sphere, except that its enactments may not violate the constitution which also governs the exercise of the powers of the executive and the judiciary. 49 Am. Jur. 252 *et seq.* All are equally subject to its provisions, express and implied by necessity. The possibility of the abuse of legislative power does not disprove its existence. *Powell v. Pennsylvania,* 127 U. S. 678, 8 S. Ct. 992, 1257, 32 L. Ed. 253.

There is a plain constitutional safeguard against overburdening bonds. Overlapping subdivisions are limited in this respect by provisions of the constitution which evidence the foresight of the framers. Section 5 of Art. X is as follows: "The bonded debt of any county, township, school district, municipal corporation or political division or subdivision of this State shall never exceed eight *per centum* of the assessed value of all the taxable property therein". This of course applies to the Auditorium District and limits the amount of bonds which may be issued to a sum equal to eight per centum of the assessed value of the taxable property situate within its boundaries. The same section contains the further provision as follows: "And whereever there shall be several political divisions or municipal corporations covering or extending over the same territory, or portions thereof, possessing a power to levy a tax or contract a debt, then each of such political divisions or munici-

pal corporations shall so exercise its power to increase its debt under the foregoing eight per centum limitation that the aggregate debt over and upon any territory of the State shall never exceed fifteen per centum of the value of all taxable property in such territory as valued for taxation by the State * * *". A clear exposition of this provision is contained in the opinion of this court in *Todd v. City of Laurens,* 48 S. C. 395, 26 S. E. 682. The separate bonded debt of the State as such is not to be prorated to any particular subdivision in order to ascertain whether the fifteen per centum limitation has been reached in the territory of the subdivision. *Lancaster School District v. Robinson-Humphrey Co.,* 64 S. C. 545, 42 S. E. 998.

One of the questions presented here is the query whether the Auditorium District may issue bonds for the purposes authorized by the legislature to the full extent of eight per centum of the taxable property which it contains regardless of the fifteen per centum limitation which we have just quoted from the constitution. The necessity of negative answer seems too plain to require elaboration. Former decisions (subsequent to *Todd v. City of Laurens, supra*) have been cited wherein the fifteen per cent limitation appears not to have been applied to the issuance of bonds by the subdivisions there involved, respectively. They are: *Elliott v. Heyward,* 127 S. C. 468, 121 S. E. 257, a county; *Banks v. School District,* 129 S. C. 218, 123 S. E. 834, a school district; *Bagnal v. Clarendon-Orangeburg Bridge District, supra,* 131 S. C. 109, 126 S. E. 644, a bridge district composed of two counties under a special act of the legislature; and *Winstead v. Williams,* 132 S. C. 365, 128 S. E. 46, a city or town.

The result of the cited decisions, to which we adhere, was that the particular subdivisions validy issued and sold the bonds which were questioned in those actions, but none of the cases constitutes a precedent which is controlling of this case; none involved an auditorium district authorized to issue general obligation bonds payable from property taxes.

It is concluded without difficulty that the fifteen per centum constitutional limit is applicable to the bonds which may be issued by the Auditorium District under the statutes applicable to it.

A subsidiary question is whether in the calculations necessary to establish the validity of any bonds which may be issued, it is necessary to take into consideration the outstanding bonds of Greater Greenville Sewer District, a subdivision which is distinct from the Auditorium District but is embracive of the same territory. The answer is no, under the authority of *Rutledge v. Greater Greenville Sewer District et al., supra,* 139 S. C. 188, 137 S. E. 597.

It has been stated that the proposed issuance of the bonds of the Auditorium District was submitted at an election held at the instance of the Board pursuant to the original Act of 1940, which resulted in favor of the issuance. The Board has been held to have been unlawfully constituted, but this does not adversely affect the authorization for the issuance of the bonds. The latter is true by reason of the confirmation and ratification by the General Assembly by its Act No. 332 of 1945, 44 Stat. 956, which expressly again authorized the issuance of the bonds, with all of the usual provisions of such an act of ratification. See sec. 2, at page 957 of the 44th volume of Statutes. The General Assembly could have in the first place authorized the issuance and sale of the bonds upon the terms stated without submission of the question at a popular election. There is no constitutional requirement of a referendum upon the question of the issuance of bonds by a specially created district just as there is none with respect to a school district (*Zeigler v. Thompson,* 119 S. C. 101, 111 S. E. 880), a high school district (*Powell v. Hargrove, supra,* 136 S. C. 345, 134 S. E. 380) or a county (*Lillard v. Melton, supra,* 103 S. C. 10, 87 S. E. 421). By amendment of the constitution referendum was required in the case of *Union Hospital District. McLure v. McElroy,* S. C., 44 S. E. (2d) 101, decided at this term. Indeed, in the absence of pertinent amend-

ment the constitution requires an election upon the bond issues of only the State itself, a city or a town. *Zeigler v. Thompson, supra,* 119 S. C. 101, 111 S. E. 880.

The ratification by legislative act was effective to cure intervening irregularities in the election and the other proceedings simply because the legislature might have originally authorized the bonds without the election and other local proceedings. *Hodge v. School District,* 80 S. C. 518, 61 S. E. 1009; *Fripp v. Coburn,* 101 S. C. 312, 85 S. E. 774. Other similar decisions from this court are found in 7 S. E. Dig. 581, Constitutional Law, Curative acts, Key No. 193.

The proposed bonds, when issued in an amount within the applicable constitutional limits which have been discussed, will be valid obligations of the District in accord with the terms of the enabling acts. Of course, they can only be issued after additional legislation provides a proper administrative or governing board for the District.

There remains only to apply the facts and figures of the outstanding bonds of the other subdivisions (including the county and city of Greenville and the school district or districts) which overlap the Auditorium District in order to determine whether the full amount of the bonds authorized may be legally issued and sold by the latter, or to what extent, if less than the whole amount authorized. The figures in the record are not clear enough for the court to now undertake these calculations and determine the result. Moreover, the figures are stale at best, having become so during the prolonged pendency of the action. The task will therefore not be undertaken. Fresh facts and figures will have to be ascertained before final opinion upon the validity of the bonds in this respect.

The result of all of the foregoing may be briefly summarized as follows: The General Assembly has validly created a new governmental subdivision, consisting of the territory of Greenville County which comprises Greater Greenville Sewer District, and authorized it to issue and sell $300,000-

.00 bonds, construct therewith (and also by other means) and operate a public auditorium for the purposes stated in the enabling acts, for which property taxes are authorized to be levied; but there is no executive or administrative board or agency to accomplish the legislative purpose. A too important part of the legislation is invalid for it to serve as intended, without amendment. It is obvious that the Auditorium District cannot function under the present law. The latter must be supplemented by proper amendment in order for the bonds to be issued and sold and the legislative intent achieved. And the validity of the proposed bonds depends upon the proof of facts which pertain to the constitutional limits which have been stated.

The judgment of the lower court is reversed to the extent and in the particulars pointed out herein. In all other respects it is affirmed.

BAKER, C.J., and FISHBURNE, TAYLOR, and OXNER, JJ., concur.