17545

C. S. BERRY and A. J. White, for the benefit of themselves and other similarly situated taxpayers of Spartanburg and Greenville Counties, Petitioners v. Roger MILLIKEN, L. A. Odom, S. J. Workman, Hugh Aiken, W. T. Adams and John Ratterree, individually and as Commissioners of the Greenville-Spartanburg Airport District, and the Greenville-Spartanburg Airport District, a body corporate, Respondents.

(109 S. E. (2d) 354)

*Messrs. Rufus M. Ward,* of Spartanburg, and *Ray R. Williams,* of Greenville, *for Petitioners,*

*Messrs. Kerr & Evins,* of Spartanburg, and *Haynsworth, Perry, Bryant, Marion & Johnstone,* of Greenville, *for Respondents,*

June 11, 1959.

OXNER, Justice.

In this action, which we permitted to be brought in the original jurisdiction of this Court, the parties seek a de-

termination of the validity of Act No. 99 of the 1959 Acts of the General Assembly, 51 St. at L. p. 101, creating the Greenville-Spartanburg Airport District and if found to be valid, the restrictions applicable to any bonded indebtedness which may be incurred.

The Act creates a political subdivision to be known as "The Greenville-Spartanburg Airport District", extending over the entire area embraced by the counties of Greenville and Spartanburg, for the purpose of establishing and maintaining an  airport and air navigation facilities to serve the people of the district and the public generally. The corporate powers and duties are to be exercised by a Commission appointed by the Governor. For the purpose of defraying the cost of constructing and establishing such airport facility, the Commission is authorized to issue general obligation bonds in an amount not exceeding six million dollars, or such lesser amount as might be required after giving regard to any State or Federal funds that might be received for this purpose. Said bonds, together with interest thereon, are to be paid by an ad valorem tax on all property in the district to be annually levied by the Comptroller General, collected by the County Treasurers of Greenville and Spartanburg Counties and paid by them to the State Treasurer, who is required to set said taxes apart in a special fund and apply them to the payment of said bonded indebtedness. The Commission is also authorized to issue notes or bonds payable solely from the revenue derived from any facilities in its charge for the purpose of improving and maintaining said airport.

The first contention made by petitioners is that the Act is special legislation of the sort prohibited by Section 34 of Article III of the Constitution. They say the "Uniform Airports Act" enacted in 1937, 40 St. at L. 466, now comprising with amendments, Sections 2-101 through 2-120 of the 1952 Code, is applicable and shows that the subject is reasonably susceptible of general treatment. It is of interest to note that the General Assembly has

subsequently made special provisions with reference to airports in various counties, thus indicating the opinion of the Legislature that a general act could not apply to all situations in this field of legislation. The Uniform Airports Act authorizes municipalities, counties or other political subdivisions, separately or jointly, to establish and maintain airports but provides that no county shall exercise the authority thereby conferred "outside of its geographical limits except in an adjoining county and this only jointly with such adjoining county". In its enactment here the General Assembly determined that it would not be feasible for the airport under consideration to be operated jointly by Spartanburg and Greenville Counties and that it would be necessary to create an airport district embracing this area with powers more comprehensive than those contained in the general act. The territory involved constitutes the most thickly populated and most highly industrialized part of South Carolina. It can readily be seen that an airport of this size might require treatment different from one in a smaller county. The determination of the question as to whether a general law can be made applicable in a particular situation is, in the ultimate analysis, a decision for this Court as the final arbiter of the meaning of the State Constitution. We had occasion recently in *Mills Mill v. Hawkins,* 232 S. C. 515, 103 S. E. (2d) 14, to review our decisions upholding the validity of legislation creating special purpose districts. It is clear from these authorities that the Act under consideration does not violate the inhibition against a special law where a general law can be made applicable.

It is next contended that the General Assembly may not create a special airport district and empower it to issue general obligation bonds.

It is well settled under a long line of decisions originating in the Court's holding in 1915 in the case of *Lillard v. Melton,* 103 S. C. 10, 87 S. E. 421, 428, and including the relatively recent decision of *Ashmore v. Greater Greenville Sewer District,* 211 S. C. 77, 44 S. E. (2d) 88, 173 A. L. R.

397, that the Legislature is empowered to carve out a district from a territory of the State for the accomplishment of some public purpose. Circuit Judge Mendel Smith, in writing the majority opinion for the *en banc* Court, quoted approvingly in the *Lillard case* from Dillon on Municipal Corporations as follows:

"It must now be conceded that the great weight of authority denies *in toto* the existence, in the absence of special constitutional provisions, of *any inherent right of local self-government which is beyond legislative control.* The Supreme Court of the United States has declared that a 'municipal corporation, in the exercise of all its duties, including those most strictly local or internal, is but a department of the state. The Legislature may give it (political units) all the powers such a being is capable of receiving, making it a miniature state within its locality; or it may strip it of every power, leaving it a corporation in name only; and it may create and recreate these changes as often as it chooses, or it may itself exercise directly within the locality any or all the powers usually committed to a municipality. * * *' "

And as noted in our decision in the *Ashmore case,* the express references to "other subdivisions" in Article X, § 6 of the Constitution indicate that no attempt was made in the present South Carolina Constitution to restrict the plenary power of the Legislature in so far as the creation of special purpose districts were concerned. We held in *Evatte v. Cass,* 217 S. C. 62, 59 S. E. (2d) 638, that the expenditure of public funds for the establishment, improvement, and maintenance of an airport subserves a public purpose. It thus follows that the creation by the Legislature of a special purpose district for the purpose of establishing and maintaining a public airport is a lawful exercise by the General Assembly of its plenary power to create special purpose districts.

But petitioners earnestly urge that the 1945 amendment to Section 6, Article X of the Constitution, which permits counties and townships to levy a tax or issue bonds for the construction and maintenance of an

airport, by implication forbids a special district from levying a tax or issuing bonds for that purpose.

It was held in *Gentry v. Taylor,* 192 S. C. 145, 5 S. E. (2d) 857, and *Parrott v. Gourdin,* 205 S. C. 364, 32 S. E. (2d) 14, that a county was not authorized to levy a tax or issue bonds for the establishment of an airport because this was not among the purposes enumerated in Section 6, Article X of the Constitution for which a county may be authorized to levy taxes. Subsequently in 1945 this section was amended by providing "that the General Assembly shall have power to authorize a county or township to levy a tax or issue bonds for the purposes of construction and maintenance of an airport or the construction and maintenance of landing strips." It is argued that the necessary implication from this amendment is that only the governmental units therein named may levy a tax for the construction or maintenance of an airport. We concluded otherwise in *Evatte v. Cass, supra,* 217 S. C. 62, 59 S. E. (2d) 638. It was there noted that the restrictions imposed by Section 6 of Article X relate solely to counties and townships, and did not restrict the power of the General Assembly to permit incorporated municipalities to expend public funds for airport facilities. Since the district here created is not in the category of a county or a township, it follows that Section 6 of Article X does not limit the purposes for which it may issue bonds and levy taxes.

The next two questions are so intertwined that they will be considered together. They are: (1) Is the Greenville-Spartanburg Airport District a political division or subdivision of the State within the contemplation of Section 5 of Article X of the Constitution? (2) Would obligations incurred by said district constitute bonded indebtedness within the meaning of said section? We think *Ashmore v. Greater Greenville Sewer District, supra,* 211 S. C. 77, 44 S. E. (2d) 88, 173 A. L. R. 397, requires an affirmative answer to both questions. It was there held that a special district created to construct and operate a public auditorium was subject to the limitations prescribed by this

Section, and that taxes levied for this purpose were not assessments but general taxes.

The three cases cited by respondents to sustain their contention that the taxes levied under this Act constitute in reality assessments for benefits conferred upon property in the district, are distinguishable. The first, *Jackson v. Breeland,* 103 S. C. 184, 88 S. E. 128, involved a drainage district. The assessments imposed by that district were specifically authorized by Article I of the amendments to the Constitution found on Page 349 of Volume 7 of the 1952 Code. On this basis the Court held that such a district was not a political subdivision within the meaning of Section 5 of Article X, and bonds issued by it would not constitute indebtedness within the contemplation of this Section because the taxes imposed were not taxes in the ordinary sense but equitable assessments on the lands to be benefited. The second, *Evans v. Beattie,* 137 S. C. 496, 135 S. E. 538, involved an act creating a highway district embracing six counties which was made a political subdivision of the State. The taxes levied under the act were considered not as a general tax but a special assessment for the benefit of all property owners in the district. It was held that the district was not restricted by the limitations contained in Article X, Section 5 because (1) the so-called tax was a special assessment for local improvements, and (2) the bonds were to be paid from monies received from the Highway Department under reimbursement agreements and a gasoline tax to be distributed to the six counties. The last named conclusion was based upon the well established principle in South Carolina that obligations secured by the pledge of a fund which might reasonably be expected to be sufficient to meet same without resorting to the levy of a property tax, do not constitute bonded indebtedness within the meaning of the constitutional limitations, notwithstanding that the full faith, credit and taxing power of a political subdivision are pledged for the payment of such obligations. It was held in the third case, *Rutledge v. Greater Greenville Sewer District,* 139 S. C. 188,

137 S. E. 597, that bonds issued by a sewer district were not obligations within the meaning of Section 5 of Article X, and the *ad valorem* taxes levied for their payment were in reality assessments for benefits received, because the property subject to the assessment received a direct benefit from the improvement.

While airports have been characterized as the "highways of the air", *People ex rel. Curren v. Wood,* 391 Ill. 237, 62 N. E. (2d) 809, 813, 161 A. L. R. 718; we do not feel justified in extending the doctrine of the *Evans case* to the special purpose district involved here. We do not discount the importance of aviation as a means of travel or the convenience afforded by an airport to the people in the surrounding area. But it would be far-fetched to say that the property to be taxed to construct and maintain the airport here will be specially benefited so that the *ad valorem* tax imposed upon it can be regarded as an assessment for a benefit conferred. It is of no more significance in enhancing property values than an auditorium which was held in the *Ashmore case* not to be of such character as to warrant an assessment for special benefits.

Nor does the record furnish any basis for the application of the "Special Fund" doctrine. While Federal grants are contemplated, they are to be used to supplement the amount raised from the bonds and not to discharge them.

There remains the question of whether the bonds proposed to be issued are subject to both the 8% and the 15% debt limitations imposed by Article X, Section 5 of the Constitution, which read as follows:

"The bonded debt of any county, townships, school district, municipal corporation or political division or subdivision of the State shall never exceed eight per centum of the assessed value of all the taxable property therein. And no county, township, municipal corporation or other political division of this State shall hereafter be authorized to increase its bonded indebtedness if at the time of any proposed in-

crease thereof the aggregate amount of its already existing bonded debt amounts to eight per centum of the value of all taxable property therein as valued for State taxation. And wherever there shall be several political divisions or municipal corporations covering or extending over the territory, or portions thereof, possessing a power to levy a tax or contract a debt, then each of such political divisions or municipal corporations shall so exercise its power to increase its debt under the foregoing eight per centum limitation that the aggregate debt over and upon any territory of this State shall never exceed fifteen per centum of the value of all taxable property in such territory as valued for taxation by the State."

Respondents apparently concede, and correctly so, that if, as we have found, any obligations issued by this district would be bonds within the meaning of the foregoing section, the 8% debt limit provision would apply but vigorously assert that the district would not be governed by the 15% limitation.

We have held that the proper interpretation to be given to that portion of Section 5 of Article X which relates to the 15% overlapping limitation is that it has no application to counties (*Elliott v. Heyward,* 127 S. C. 468, 121 S. E. 257), to incorporated municipalities (*Winstead v. Williams,* 132 S. C. 365, 128 S. E. 46), to school districts (*Banks v. School District,* 129 S. C. 218, 123 S. E. 834), or to a district embracing two counties created for the purpose of building a connecting bridge (*Bagnall v. Clarendon & Orangeburg Bridge District,* 131 S. C. 109, 126 S. E. 644). For other cases construing this provision see South Carolina Law Quarterly, Volume 3, page 318; annotations 94 A. L. R. 818 and 171 A. L. R. 730. In each of the foregoing cases it was held that the political unit involved was entitled to increase its indebtedness up to the 8% maximum of the value of the taxable property therein, notwithstanding that such increase would operate to increase to more than 15% the indebtedness of other political units whose boundaries were

coterminous or overlapping with those of the unit seeking to incur the additional indebtedness.

Whatever may be said as to the soundness of these decisions, it is now too late to disturb them, for upon the strength of them millions of dollars in bonds have been issued and are outstanding. In addition to this, the corporate authorities of many of the governmental units mentioned in these decisions have upon the strength of them made plans and perhaps commitments for capital improvements in the belief that this Court would adhere to its former rulings. Serious prejudice would result if they now had to resort to the time consuming process of constitutional amendment. As was stated in *Mills Mill v. Hawkins, supra,* 232 S. C. 515, 103 S. E. (2d) 14, 19, "In this field (of public finance), as in the case of the law relating to real estate, it is very important that there be stability and uniformity in our decisions."

While we will not disturb these cases, we shall not enlarge upon them. But it requires no extension of these decisions to hold that the district here created is not subject to the 15% debt limitation. To them should be added the decision in *Lancaster School District v. Robinson-Humphrey Co.,* 64 S. C. 545, 42 S. E. 998. It was there held that the separate bonded debt of the State as such is not to be prorated to any particular subdivision in order to ascertain whether the 15% limitation has been reached in the territory of such subdivision.

For the purpose of providing airport facilities to serve a large area in the Piedmont section of the State, with a population of about 10% of that of the entire State, the General Assembly found it necessary to go beyond the boundaries of a single county. The district here involved is not a political subdivision within a county as was the case in *Ashmore v. Greater Greenville Sewer District, supra,* 211 S. C. 77, 44 S. E. (2d) 88, 173 A. L. R. 397, where we applied the 15% limitation. The situation now before us is strikingly similar in many respects to that in *Bagnall v. Clarendon & Orange-burg Bridge District, supra,* 131 S. C. 109, 126 S. E. 644.

There a bridge district was created embracing two counties, which was made a political subdivision of the State and empowered to issue general obligations carrying the full faith and credit of the district. There, as here, the tax levy to pay these obligations was not made by the corporate authorities of the district but by the Legislature itself.

Our conclusion that this district is not bound by the 15% limitation eliminates the necessity of determining a subsidiary question as to whether bonds issued by certain governmental units within the district, pursuant to special dispensation granted by certain constitutional amendments, should be deducted in determining if the 15% limitation has been exceeded.

It is, therefore, adjudged that the statute here involved is a valid enactment, and that the only constitutional limitation controlling the debt limit of the district created by said Act is the 8% limitation found in Section 5 of Article X.

STUKES, C. J., and TAYLOR and MOSS, JJ., concur.

LEGGE, J., concurs in part and dissents in part.

LEGGE, Justice (concurring in part and dissenting in part.)

Concurring in the conclusions of the majority opinion as to the other constitutional issues presented in this case, I find myself unable to agree that the fifteen per cent overall debt limitation prescribed by Section 5 of Article X is not applicable here.

That section is set out in full in the majority opinion, and need not be reproduced here. Its manifest purpose is to protect property within "any territory of this State" overlapped by two or more political subdivisions or municipal corporations against excessive taxation, by forbidding their aggregate debt over such territory to exceed at any time fifteen per cent of the assessed value of all taxable property therein. Its clear language contains no suggestion that a county, or an incorporated municipality, or a school district, or a bridge district, or any other political subdivision or municipal cor-

poration, whether located within a county or extending into or over more than one county, is to be excluded from its operation. The words "any territory of this State" completely negate any such idea. That no such exclusion was intended is evidence from the opinion by Mr. Justice Pope in *Todd v. City of Laurens,* 48 S. C. 395, 26 S. E. 682, and from the fact that Section 5 of Article X has been amended some eighty times for the purpose of obtaining exclusion of various political subdivisions and municipal corporations from its operation.

Nor is there to be found in the language of the Section any sound basis for the proposition suggested in *Bagnall v. Clarendon & Orangeburg Bridge District,* 131 S. C. 109, 126 S. E. 644, and referred to in the majority opinion here, that its prohibition may be avoided by having the tax levy made by the Comptroller General. The fifteen per cent limitation is directed to the amount of the district's debt (in this case to be created by its Commission through the issuance of general obligation bonds), not to the mechanics of the tax levy.

In the cases cited in the majority opinion (*Elliott v. Heyward,* 127 S. C. 468, 121 S. E. 257; *Banks v. School Dist. No. 18, Greenwood County,* 129 S. C. 218, 123 S. E. 834; *Bagnall v. Clarendon & Orangeburg Bridge District,* 131 S. C. 109, 126 S. E. 644; and *Winstead v. Williams,* 132 S. C. 365, 128 S. E. 46) the Court has either ignored or attempted to evade the plain language of the constitutional limitation. The majority opinion, tacitly conceding that those decisions are unsound, concludes that despite their unsoundness we should follow them because under them bonds have been issued and are outstanding—to put it otherwise, because it may be economically inexpedient to overrule them. It is difficult to perceive how the rights of holders of such obligations can be impaired by our decision in the instant case. At all events that is a matter with which we are not properly concerned here.

If the language of the constitutional mandate were of doubtful import and had been consistently construed to mean a certain thing, I should feel bound to adhere to that construction despite my doubt of its correctness. But that is not the situation here. The decisions referred to above, since *Todd v. City of Laurens,* have in reality amounted not to a uniform interpretation of the fifteen per cent limitation, but to its progressive amendment. They cannot be justified on judicial grounds. They should be repudiated, and effect should be given at last to the plain, unambiguous language of the constitutional limitation. Our duty is to preserve the Constitution, not to perpetuate so manifest a judicial error in its interpretation.